Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Peter Klausner (SBN 271902)
pklausner@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Los Angeles, California  91436
Telephone:  (818) 839-2333

Anthony Irpino (*pro hac vice* to be filed)
airpino@irpinolaw.com
Pearl Robertson (*pro hac vice* to be filed)
probertson@irpinolaw.com
Irpino Law Firm, LLC
2216 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 525-1500

Attorneys for Plaintiff
ERIC DWAYNE COLLINS a/k/a "RBX,"
individually, and on behalf of other
members of the general public similarly
situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC DWAYNE COLLINS a/k/a "RBX," individually, and on behalf of other members of the general public similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>SPOTIFY USA, INC., SPOTIFY TECHNOLOGY, S.A., and SPOTIFY AB,<br><br>　　　　　Defendants. | Case Number: _____<br>**CLASS ACTION**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

For his complaint against Defendants SPOTIFY USA, INC., SPOTIFY TECHNOLOGY, S.A., and SPOTIFY AB (hereinafter and collectively, "Spotify," or "Defendants"), Plaintiff ERIC DWAYNE COLLINS a/k/a "RBX" ("Plaintiff"), individually, and on behalf of all other members of the general public similarly situated ("the Class"), based on information and belief, alleges as follows:

## INTRODUCTION

1.      To make it in the music business, you need a unique mix of extraordinary talent, determination, skill, and luck and once you get on top, it's even harder to stay there.  Some say the music business is a "Hustle" because it's a dog-eat-dog environment and you need to think of ways to break new ground every day.  The famous American journalist and author Hunter S. Thompson once said, "The music business is a cruel and shallow money trench . . . There's also a negative side."

2.      When it comes to recorded music, every month, more than a hundred thousand artists, songwriters, and producers are forced to compete for their share of a limited pool of royalty payments from Spotify.  Success begets success and a higher "streamshare" means not only more money, but also placement on top ten playlists, playlists that further increase streamshare, and other promotional attention.  In the face of this competition, some take the Hustle too far – they resort to cheating.  Every month, under Spotify's watchful eye, billions of fraudulent streams are generated from fake, illegitimate and/or illegal methods (*e.g.*, bots).

3.      As described herein, data analysis shows that billions of fraudulent streams have been generated with respect to songs of "the most streamed artist of all time," Aubrey Drake Graham, professionally known as Drake ("Drake").  But while the streaming fraud with respect to Drake's songs may be one example, it does not stand alone.

4.      This mass-scale fraudulent streaming causes massive financial harm to legitimate artists, songwriters, producers and other rightsholders whose proportional share is decreased as a result of fraudulent stream inflation on Spotify's platform.

5.      Spotify publicly claims that it has policies and procedures in place to root out fraud, but its purported system is nothing more than window dressing, inadequate at best. The truth is, like the artists who compete on its site, Spotify is engaged in a hustle of its own.  To satisfy constant pressure from shareholders to grow the business and increase stock prices, Spotify needs an ever-expanding population of users to engage on its platform.  Accordingly, Spotify is all too happy to turn a blind eye to the substantial number of fake users on its platform whose activities are controlled by artificial bots to fraudulently inflate streams.  The more users (including fake users) Spotify has, the more advertisements it can sell, the more profits the company can report, all of which serves to increase the purported value delivered to shareholders.

6.      Plaintiff is a world-renowned performer who, for decades, has used his voice to dazzle audiences across the globe.  He comes forward now to use his voice for a new purpose.  Plaintiff brings this case to bring justice for his brother and sister creators and entertainers.  In doing so, Plaintiff gives a voice to more than one hundred thousand rightsholders who, among other things, may be unable or too afraid to challenge Spotify, a powerful force in the music business whose failure to act has caused significant problems and great financial harm.

## NATURE OF THE ACTION

7.      This action is brought on behalf of Plaintiff and a similarly situated class of music recording artists, song writers, performers, and other music rights holders (collectively, the "Rights Holders")[1] who derive revenue from the music streaming

---

[1] "Rights Holders" refers to any individual or entity that owns, controls, or possesses an interest in the intellectual property rights associated with a musical work or sound recording. This includes any person or entity legally entitled to receive compensatory payments or royalties arising from the use, performance, or distribution of their work. Rights Holders may include, but are not limited to, artists, songwriters, composers, record labels, music publishers, producers, and any other parties that have obtained or retained ownership or control of the relevant rights through statutory provisions, assignments, or contractual arrangements.

service known as "Spotify."

8.      These Rights Holders derive revenue from having music—to which they possess mechanical and publishing royalty rights—made available to Spotify's millions of subscribers.

9.      Spotify generates substantial sums of money by charging its subscribers a monthly fee, as well as by including paid-for advertisements across its services. The subscription and advertising dollars combine monthly to create a "revenue pool."

10.     Spotify distributes portions of this revenue pool to individual Rights Holders on a monthly basis, based on their proportional share of total music streams for that month ("streamshare"). The more music streams for an artist's songs, the more revenue allocated to the Rights Holders for those songs.

11.     Plaintiff's claims concern "streaming fraud"—the unlawful, deceptive and fraudulent practice of artificially inflating the number of instances in which music is "streamed" from Spotify through various means, including through the use of automated computer "Bots."

12.     The use of Bots to artificially increase the number of music streams for certain artists increases the share of revenues allocated to those artists whose streamshare is artificially inflated, at the expense of Plaintiff and other Rights Holders whose revenue shares are diminished by this unlawful streaming fraud.

13.     Spotify publicly represents that streaming fraud is prohibited from its service and that it takes measures to detect, prevent, and remedy such fraud. In actuality, however, Spotify deploys insufficient measures to address fraudulent streaming.

14.     Moreover, Spotify deliberately turns a blind eye to fraudulent streaming because Spotify benefits from the increased number of overall music streams generated by Bot accounts and other fraudulent means. For Spotify, more users and music streams means more advertising dollars, so long as the true origin of the streams remains hidden.

15.     As a result of Spotify's insufficient measures and/or their turning a blind eye, streaming fraud is rampant, accounting for a substantial percentage of the total music streams on Spotify.

16.     This fraudulent, and often bot-supported streaming dramatically and improperly increases the revenue share for a select number of artists and publishers, while it diminishes the shares for other Rights Holders whose music is streamed by legitimate users. In other words, by allowing this fraudulent streaming to take place, through negligence and/or willful blindness, Spotify breaches the duties it owes to Rights Holders and causes them substantial financial harm.

17.     Spotify's conduct is carried out in violation of California law and the common law.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

19.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

20.     Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), because each of the Defendants transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims in this lawsuit occurred, among other places, in this District.

## PARTIES

21.     Plaintiff Eric Dwayne Collins (hereinafter "Plaintiff Collins" or "Mr. Collins"), known professionally as "RBX" is an individual and recording artist residing in

Long Beach, CA, and is a citizen of the State of California.

22.    Defendant Spotify USA, Inc., is a Delaware corporation with headquarters in New York City. It is a digital music, podcast, and video service and it is the world's most popular audio streaming subscription service.

23.    Defendant Spotify Technology S.A. is a Luxemburg based business with its headquarters in Stockholm, Sweden. It is the parent company of defendants Spotify AB and Spotify, USA, Inc.

24.    Defendant Spotify AB, a company organized under the laws of Sweden, is a wholly-owned subsidiary of Spotify Technology S.A., a publicly-traded corporation organized under the laws of the Grand Duchy of Luxembourg.

25.    Plaintiff is informed and believes, and based thereon alleges that, at all material times herein, each of the Defendants was the agent, servant, or employee of the other Defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Defendants, and ratified and approved the acts of the other Defendants.

26.    Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with wrongful acts alleged, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants.

## FACTUAL BACKGROUND

### A. The Music Streaming Business

27.    "Music streaming services" are a particular type of online media, focused primarily on music, podcasts, and other digital media, that allow subscribers (often paid subscribers) to listen to—or "stream"—music and podcasts on demand. These streaming services typically host digital media in centralized online libraries, and subscribers can and do freely stream the content without downloading it.

28.    Music streaming is big business. It's estimated that music streaming generated $46 billion dollars in revenues in 2024, with North America representing the largest market.  Most streaming services offer premium, ad-free content for a fee, in contrast to a free, ad-supported version.

29.    Generally, every time a song or podcast is streamed through one of these streaming services, Rights Holders are compensated with royalties.  The amount of royalty payments owed varies depending on a number of factors, and is often less than one cent per stream, but for artists whose music is streamed by a large number of subscribers, the total revenue can be enormous.

30.    For streaming services that generate revenue depending on the number of songs downloaded or streamed, the potential revenue is limitless. The more songs streamed, the more revenue generated.

31.    Alternatively, some streaming services, such as Spotify, generate "revenue pools" from, among other things, the subscription fees paid by monthly subscribers as well as advertising revenue.  Rights holders are paid a percentage of the revenue pools based on a formulation that correlates the percentage of total streams attributable to individual rights holders against the total volume of streams for all songs. In this regard, the total revenue to be divided-up between rights holders is finite and untethered to the number of individual songs streamed.

32.    Any time a Rights Holder's share of the revenue pool increases due to increased music streams, the shares for other Rights Holders necessarily decrease. Indeed, as Drake, once explained in a legal filing, "[s]treaming and licensing is a zero-sum game."

33.    Thus, if some form of streaming fraud results in an artificial increase of certain Rights Holders' shares of the revenue pool (see below), it necessarily comes at the expense of other Rights Holders whose songs were legitimately streamed by real consumers, and whose share of the revenue pool necessarily decreases.

**B. Spotify**

34.     Defendants Spotify USA, Inc., Spotify Technology S.A., and Spotify AB (collectively, "Spotify"), together are a digital music, podcast, and video service. Spotify is the world's most popular audio streaming subscription service.  As of the end of the second quarter of 2025, Spotify reported that it had more than 696 million monthly active users, with 268 million premium subscribers.

35.     Spotify pays music companies, artists, and other rights holders for the right to license songs so it can play them on its streaming and subscription platforms. In 2023 alone, Spotify paid more than $9 billion in royalties to music labels and producers.

36.     Spotify provides both premium, ad-free subscriptions for which subscribers pay a monthly fee, as well as free, ad-supported subscriptions.

37.     Streaming subscriptions are essential to Spotify's bottom-line, as they, along with advertisements, are the primary source of Spotify's revenue.

38.     Like many music streaming services, Spotify relies on metrics such as "Total Monthly Active Users" ("MAUs") to forecast company success and market to investors and advertisers. The higher the number of MAUs, the more Spotify can charge advertisers to deploy ads across its service.  The same is true for the number of total music streams—the higher the number of individual streams, the more Spotify can charge advertisers.

39.     Illustrating the significance of MAUs to its business, in its securities filing statements to investors, Spotify touts that it is "the world's most popular audio streaming subscription service."  In its July 2025 Form 6-K U.S. Securities and Exchange Commission ("SEC") filing, Spotify further states, "[w]ith a presence in 184 countries and territories, our platform includes 696 million monthly active users ("MAUs"), including 276 million Premium Subscribers . . . as of June 30, 2025."[2]

40.     Also, in its July 2025 Form 6-K SEC filing, under the heading, "Key Performance Indicators," Spotify emphasizes the significance of MAUs, stating "[w]e

---

[2] https://s29.q4cdn.com/175625835/files/doc_financials/2025/q2/Q2-25-Form-6K.pdf at p. 28.

track MAUs as an indicator of the size of the audience engaged with our Service."[3] Indeed, Spotify expressly acknowledges the connection between MAUs and its financial success – stating that "[w]e invest heavily in research and development in order to drive user engagement and customer satisfaction on our platform, which we believe helps drive organic growth in MAUs, which, in turn, drives additional growth in, and better retention of, Premium Subscribers, as well as increased advertising opportunities to our users."[4]

41.    Further Illustrating the significance of MAUs as well as user growth to the company's value, Spotify represents to investors that "[o]ur 696 million MAUs have grown 11% year-over-year, as of June 30, 2025."[5]

42.    Moreover, Spotify recognizes the materiality of identifying real users and further states, "we strive to detect and minimize non-bona fide accounts that may typically be created in an attempt to artificially stream content, they may contribute, from time to time, to an overstatement in our reported MAUs."[6]

43.    Rather than paying rights holders for each and every individual music stream, Spotify collects money from monthly subscribers and advertisers and pays rights holders a share of the resulting revenue pool, based on the rights holders' share of music streams attributable to their music.

**C. Streaming Fraud**

44.    For several years, certain bad actors have engaged in "streaming fraud," whereby music streams are artificially and fraudulently increased for certain artists in order to increase the revenue share for the Rights Holders of those artists, thereby capturing ill-gotten music royalties that would otherwise be owed to other Rights Holders whose own revenue shares have been diminished by the fraud.

---

[3] *Id*. at p. 29.

[4] *Id*. at p. 31.

[5] *Id*. at p. 28.

[6] *Id*. at p. 29.

45.     Often times, streaming fraud is carried out by deploying "Bots," which are automated software programs that run scripts to perform repetitive tasks on the internet at high speeds. In the context of streaming fraud, large numbers of Bots are programmed to repeatedly and continuously stream certain songs, thereby fraudulently inflating the total number of streams for that music. These Bots are often purchased, deployed, or coordinated by third parties for the purpose of manipulating streaming metrics. The use of such Bots creates the false appearance of heightened popularity for specific artists or recordings and inflates the total number of reported streams on the platform.

46.     Often times, those engaged in streaming fraud employ "Bot Vendors" who are specialized tech and software companies that build and deploy Bots on the internet.

47.     Bot Vendors typically design Bots to mimic human behavior and resemble real social media or streaming accounts in order to avoid detection. Bot Vendors also use Virtual Private Networks (hereinafter "VPNs") which are encrypted internet connections that protect privacy and data, in part, by obscuring the physical location of the internet user. Through a series of technical devices, Bot Vendors use VPNs to obscure the true location of the Bot Accounts, making it appear as though the Bots are streaming music from all over the world, when in reality the Bot Accounts all originate from a small number of locations (in some cases a singular location), and from areas that lack the population to support a high volume of streams.

48.     There is no limit to the number of Bots that can be deployed, particularly on Spotify whose platform does not require a credit card to establish an account. Bot Vendors can utilize thousands, and in some cases, many more Bots at any one time.

49.     The use of Bots is supposedly prohibited on all major music platforms, including Spotify, as they can result in a distortion of those services' finite revenue pools, and in so doing, distort the revenue shares owed to artists and Rights Holders whose music is being streamed by legitimate users.

50.     Plaintiff is informed and believes that Spotify knew or should have known, with reasonable diligence, that fraudulent activities were occurring on its platform.

### D. Spotify's Representations

51.     Spotify expressly represents that the use of Bots—and all other forms of streaming fraud—on its platform is prohibited. Spotify acknowledges that such conduct compromises the integrity of its platform, misrepresents listener engagement metrics, and results in the improper allocation of royalty payments.[7]

52.     Spotify also represents that it deploys methods to detect, prevent, and remedy streaming fraud on its platform. In November 2023, Spotify publicly (and belatedly) announced its intention to implement a series of new policies designed to protect and strengthen the integrity of its music royalty ecosystem for both emerging and professional artists. Today, on its website, Spotify claims, "We put significant engineering resources and research into detecting, mitigating, and removing artificial streaming activity on Spotify so that nothing stands in the way of our mission of giving artists the opportunity to live off their art, and so that artists, songwriters, and rights holders are paid as fairly as possible for their work."[8] Further, "As part of these efforts, we conduct daily cleaning to ensure artificial streams are removed from public numbers in the Spotify app. This is essential to ensure a level playing field, where nobody is able to use artificial streaming to increase the perceived popularity of their music on Spotify." *Id.*

53.     The negligently overdue November 2023 announcement was followed by the negligently insufficient and/or overdue implementation of new policies beginning April 2024. Pursuant to these policies, tracks must achieve a minimum threshold of at least 1,000 streams within the preceding twelve months to qualify for inclusion in the recorded music royalty pool calculation. Spotify has characterized this change as a necessary measure to ensure that royalties are distributed only for tracks that demonstrate a minimal level of genuine listener engagement. Spotify further stated that it believes this policy "will eliminate one strategy used to attempt to game the system or hide artificial

---

[7] https://support.spotify.com/us/artists/article/track-monetization-eligibility/

[8] https://support.spotify.com/us/artists/article/third-party-services-that-guarantee-streams/

streaming, as uploaders will no longer be able to generate pennies from an extremely high volume of tracks."

54.     In addition to the stream threshold requirement, Spotify also requires that each track be streamed by a minimum number of unique listeners before becoming eligible for royalty consideration. This requirement is intended to prevent users from artificially inflating eligibility through repeated or automated streaming activity. Spotify does not publicly disclose the specific listener threshold, asserting that nondisclosure is necessary to deter manipulation of the system by bad actors.

55.     Spotify has further represented that, belatedly beginning in early 2025, it will impose financial penalties on labels and distributors in the form of per-track charges when "flagrant" artificial streaming activity is detected on their content.

56.     Through these representations and policy statements, Spotify has repeatedly conveyed to that it maintains both the capability and commitment to detect and address fraudulent streaming activity. Spotify's communications are intended to assure that the company exercises reasonable diligence in monitoring its platform and enforcing its stated anti-fraud policies.

57.     However, despite these assurances, multiple instances of artificial streaming activity have continued to occur and persist on Spotify's platform. The ongoing existence of such activity shows that Spotify's detection mechanisms and enforcement policies are ineffective, inconsistently applied, and/or insufficient to prevent or eliminate the manipulation of royalty distributions.

58.     Under a properly functioning system, when Spotify knows or should know that music streams for a particular song have been artificially and fraudulently inflated, through the use of Bots or otherwise, Spotify cannot credit those fraudulent streams to the revenue share owed to the Rights Holders for those songs.

**E. Music Streams of Drake's Music is Artificially Boosted by Bots**

59.     Drake is a well-known singer/songwriter whose music is available for streaming on Spotify. In fact, Drake is purportedly the most streamed artist of all time on

the platform. In September 2025, Drake became the first artist to nominally achieve 120 billion total streams on Spotify.

60.     However, on information and belief, there is voluminous information, of which Spotify knows or should know, showing that between January 2022 and September 2025, a substantial, non-trivial percentage of Drake's ~37,000,000,000 streams on Spotify during that timeframe were inauthentic and appeared to be the work of a sprawling network of Bot Accounts.

61.     Plaintiff is informed and believes that an examination of Drake's music streams reveals abnormal VPN usage, seemingly designed to obscure the true geographic origins of the Bot Accounts that were streaming his songs.

62.     For example, Plaintiff is informed and believes that over a four-day period in 2024, at least 250,000 streams of Drake's song "No Face" originated in Turkey, but were falsely geomapped through the coordinated use of VPNs to the United Kingdom in attempt to obscure their origins.

63.     Further, Plaintiff is informed and believes that a large percentage of the accounts streaming Drake's music were geographically concentrated around areas whose populations could not support the volume of streams emanating therefrom. In some cases, massive amounts of music streams, more than a hundred million streams, originated in areas with *zero residential addresses*.

64.     Moreover, Plaintiff is informed and believes that, Geohash data shows that nearly 10% of Drake's streams come from users whose location data showed that they traveled a minimum of 15,000 kilometers in a month, moved unreasonable locations between songs (consecutive plays separated by mere seconds but spanning thousands of kilometers), including more than 500 kilometers between songs (roughly the distance from New York City to Pittsburgh).

65.     Also, Plaintiff is informed and believes that between January 2022 and September 2025, the volume and timing of the music streams for Drake's music failed to follow typical, established streaming patterns. While most songs and/or albums see an

initial spike in streaming immediately upon release, those same songs/albums typically follow a predictable decay pattern over the following months. However, in many instances, the streams of Drake's music on Spotify saw significant and irregular uptick months—and in some cases years—after the release of his songs, with no reasonable explanations for those upticks other than streaming fraud. In other instances, Drake's decay rate was slower and less dramatic when compared to those of his contemporaries.

66.    Additionally, the number of streams of Drake's music attributable to individual accounts is staggering and irregular. For instance, Plaintiff is informed and believes that while the average Spotify listener listens to 10 songs per day, a massive amount of the accounts listening to Drake's music (Drake's "users") listened *exclusively to Drake's music for 23 hours a day*.

67.    Plaintiff is informed and believes that streaming data of Drake's music shows that less than 2% of his users accounts for roughly 15% of his overall streams. And roughly 9% of his streams are attributable to less than 1% of his users. As a result, Drake's music accumulated far higher total streams compared to other highly-streamed artists, even though those artists had far more "users" than Drake.

68.    As a result of the fraudulent streaming scheme described above, with respect to Drake's music, the Rights Holders of Drake's music (Drake and his company, Frozen Moments, LLC) saw their shares of the revenue pool substantially and artificially increased. This generated significant revenues for Drake and Frozen Moments, LLC, all at the expense of other Rights Holders whose shares and revenues were greatly diminished.

69.    The amount of streaming revenue that would otherwise have been distributed to legitimate Rights Holders but for the fraudulent boosting of Drake's music is estimated to be in the hundreds of millions of dollars.

70.    Spotify knew or should have known about the anomalies described above had Spotify employed reasonable detection measures. These artificial and inauthentic streams were readily identifiable to Spotify in light of their statistically improbable

geohashing, sudden surges in stream counts, coordinated streaming patterns, and uniquely slow and shallow decay of streaming of songs.

71.    But to date, Spotify has never properly addressed the millions—if not billions—of fraudulent and artificial music streams attributed to Drake's music, and the ill-gotten revenues from those streams have never been properly distributed among the legitimate Rights Holders to whom the revenue is properly owed.

### F. Spotify's Failure to Prevent Streaming Fraud

72.    Drake's music streams are but one notable example of the rampant streaming fraud that Spotify has allowed to occur, across myriad artists, through negligence and/or willful blindness.

73.    At all times relevant to the allegations contained herein, Spotify was one of the easiest platforms to defraud using Bots due to its negligent, lax, and/or non-existent—Bot-related security measures.

74.    For instance, Spotify offers a free, ad-supported version of its streaming service, which does not require the use of a valid credit card to sign up. This creates the ideal conditions for fraudulent Bot Accounts to create fake Spotify accounts, since Bots do not possess valid credit card numbers, and/or not in the volume required for meaningful, Bot-supported streaming fraud.





75.     And Spotify has an incentive for turning a blind eye to the blatant streaming fraud occurring on its service. Spotify derived revenue, in part, from advertising. The higher the volume of individual streams, the more Spotify could charge for ads. By properly detecting and/or removing fraudulent streams from its service, Spotify would lose significant advertising revenue.

76.     Spotify's efforts to implement countermeasures appear to have systemically failed, over at least the past four years, to prevent or detect reporting of (and allocation of streamer revenue based upon) billions of inauthentic streams.

77.     Ultimately, through negligence and/or willful blindness, Spotify failed to maintain platform integrity and failed to prevent the use of artificial Bot streaming to inflate the number of streams reported for various artists, including, but not limited to, Drake.

78.     Moreover, by representing to Rights Holders and others that Spotify employs active measures to detect, prevent, and remedy streaming fraud, and by not revealing the stark reality that streaming fraud continues to surge on its platform, Spotify conceals from

Rights Holders both the enormity of this problem, and its detrimental financial impact to legitimate Rights Holders.

## TOLLING OF THE STATUE OF LIMITATIONS

79.    Any applicable statutes of limitations have been tolled by Spotify's knowing and active concealment, and misleading actions, as alleged herein.  Plaintiff and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiff and members of the Class could not reasonably have discovered the true nature of the Defendants' wrongful conduct any earlier.

80.    Spotify knowingly, affirmatively, and actively concealed the true character, quality, and nature of the streaming fraud occurring on its platform from Plaintiff and members of the Class by falsely claiming that the problem was being addressed and remedied. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

81.    The causes of action alleged herein did or will only accrue upon discovery of the true nature of the wrongful conduct, as a result of Defendants' fraudulent concealment of material facts.  Plaintiff and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful conduct alleged herein.

## PLAINTIFF'S CLAIMS AGAINST DEFENDANTS
## PLAINTIFF ERIC DWAYNE COLLINS

82.    Plaintiff Eric Dwayne Collins, known professionally as "RBX," is an American rapper and recording artist who currently resides in Long Beach, CA. He is widely recognized for his distinctive voice and influential lyrical contributions to the foundation of West Coast hip-hop. RBX first gained popularity through his appearances on Dr. Dre's 1992 triple-platinum album *The Chronic* and Snoop Doggy Dogg's 1993 debut album *Doggystyle*, which has sold more than 11 million copies worldwide.

83.    Plaintiff Collins has also released multiple solo albums, including his 1999 debut *The RBX Files*, which achieved Gold certification, as well as *No Mercy, No Remorse* (1999) and *The Shining* (2004). His solo catalog further established him as a key contributor to the evolution of the West Coast rap sound.

84.    Building on his early success, RBX has continued to collaborate with numerous multi-platinum artists throughout his career, appearing on Eminem's *The Marshall Mathers LP* (11× Platinum), Kris Kross's *Da Bomb* (Platinum), and Warren G's *I Want It All* (Gold).

85.    RBX possesses royalty rights in a range of notable and commercially successful songs and albums, including *The Day the Niggaz Took Over, High Powered, Let Me Ride, Lyrical Gangbang, Stranded on Death Row, The Roach, Rat-Tat-Tat-Tat, Fuck With Dre Day, Remember Me, Serial Killa, Sound of My Hood, and Gangsta Love.*

86.    Plaintiff Collins' music, to which he owns the royalty rights, is available for streaming on Spotify. As such, he derives revenue from his share of the revenue pool, as determined by the total number of streams of his music.

87.    Along with the other legitimate Rights Holders, Plaintiff Collins' share of Spotify's revenue pool has been unjustly diminished and unfairly redistributed, to his financial detriment, as a result of the artificial and inflated fraudulent streaming of the music that Spotify failed to detect, address, and/or cure.

## CLASS ACTION ALLEGATIONS

88.    Plaintiff brings this action, on behalf of himself, and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

89.    Plaintiff seeks to represent the following classes defined as (and collectively referred to as the "Class"):

### Nationwide Class

All residents of the United States of America who, during the period January 1, 2018, through the present, possessed royalties rights for on-demand digital media content that

17

was hosted by Spotify (Rights Holders), and whose royalties and subscription revenue shares were diminished as a consequence of the Defendants' wrongful conduct.

**<u>California Sub-Class</u>**

All residents of the State of California who, during the period January 1, 2018, through the present, possessed royalties rights for on-demand digital media content that was hosted by Spotify (Rights Holders), and whose royalties and subscription revenue shares were diminished as a consequence of the Defendants' wrongful conduct.

Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

90.     Plaintiff reserves the right to establish additional sub-classes as appropriate.

91.     This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

92.     <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiff is informed and believes that the Class includes thousands of members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

93.     <u>Ascertainability</u>:  The identities and contact information of members of the Class are available from Defendants' records, and others can be ascertained through appropriate notice.  Notice can be provided to the members of the Class through direct

mailing, electronic communications, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

94.    Typicality:  Plaintiff's claims are typical of the claims of the other members of the Class which he seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiff and each member of the Class has been subjected to the same negligent and fraudulent conduct and have been damaged in the same manner thereby.

95.    Adequacy:  Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class, because he has no interests which are adverse to the interests of the members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling and prosecuting class actions.

96.    Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)    The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)    If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)    Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

97.    Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil

Procedure 23(b)(3).

98.     The common questions of fact include, but are not limited to, the following:

(a)     Whether Defendants engaged in unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200, *et seq*.;

(b)     Whether Defendants engaged in negligent conduct to the detriment of members of the class;

(c)     Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

(d)     Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

99.     In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b)     The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

100.    Plaintiff is not aware of any difficulty, which will be encountered in the

management of this litigation, which should preclude its maintenance as a class action.

## CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS AGAINST SPOTIFY

### FIRST CLAIM FOR RELIEF
**Negligence**

101.   Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

102.   Plaintiff brings this cause of action on behalf of himself and the members of the Nationwide Class against Spotify.

103.   Spotify, as an operator of a major digital music platform, is in a special position of confidence and trust and owes a duty to maintain the integrity of its revenue allocation system.

104.   Spotify has a duty of care to the members of the class whose music it hosts through its audio streaming service, and to whom it distributes streaming revenue. That includes the duty to monitor streaming traffic, detect and/or prevent the use of prohibited Bots and/or other illegitimate means that are deployed to distort the streaming data and artificially inflate streaming numbers.

105.   Defendants also undertook and assumed a duty to ensure that its platform was not being surreptitiously manipulated by third parties, to the financial detriment of legitimate Rights Holders.  *See* Restatement (Second) of Torts § 324A

106.   Spotify has access to detailed streaming data that would and/or should have alerted Spotify to the artificial and/or Bot-supported streaming of music, had Spotify chosen to properly monitor that data and/or properly investigate potential misuses of its streaming service.  Spotify could have then rectified the misuse of its services and ensured that members of the Class did not have their shares of the revenue pool diminished by the rampant streaming fraud taking place on its platform.

107.    In other words, Spotify had the means to both detect and properly address the fraudulent streams.

108.    Instead, Spotify breached its duty by failing to detect, turning a blind eye to, and/or failing to properly address the artificial inflating of streaming because the increase in overall music streams allowed Spotify to generate more revenue for itself. Spotify failed to put in place adequate monitoring, detection, and/or remedial measures to identify artificial streaming.

109.    By failing to properly detect, turning a blind eye to, failing to properly address, and/or allowing fraudulent Bot Accounts to artificially inflate the number of music streams for certain music, to the detriment of other Rights Holders, Spotify created an unreasonable and foreseeable risk of harm to members of the Class.

110.    By failing to properly detect, turning a blind eye to, failing to properly address, and/or allowing the above-described improper artificial inflation of streaming conduct, Spotify breached their duty of care to members of the Class by allowing Bot Accounts and/or other improper efforts to artificially, corruptly, and/or dishonestly increase the share of the revenue pool for certain artists, to the detriment of the members of the Class.

111.    Spotify's failure to properly monitor its platform, delayed and/or insufficient enforcement of anti-artificial streaming policies, and/or failure to properly address the above-described fraudulent fake streaming, has allowed third parties to implement inauthentic streams to be credited and paid, causing the misallocation of royalties from the finite revenue pool to a select number of artists, causing injury to Plaintiff and members of the Class.

112.    By allowing Bot Accounts and/or other improper methods to artificially increase certain shares of the revenue pool, the shares belonging to Plaintiff and members of the Class were diminished, and members of the Class received less money than they would have if the shares of the Bot-boosted accounts were commensurate with their percentage of legitimate music streams.

## CLAIMS BROUGHT ON BEHALF OF THE CALIFORNIA SUB-CLASS AGAINST SPOTIFY

### SECOND CLAIM FOR RELIEF
### Violation of Unfair Competition Law
### (California Business & Professions Code §§ 17200, *et seq.*)

113.   Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

114.   Plaintiff brings this cause of action on behalf of himself and the members of the Nationwide Class and California Sub-Class against Spotify.

115.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  For the reasons described above, Defendants have engaged in fraudulent business acts or practices in violation of California Business and Professions Code sections 17200, *et seq*.

116.   Spotify repeatedly and dishonestly represented that it would detect, prevent, and remedy streaming fraud on its platform. But Spotify never made good on these representations. Instead, Spotify turned a blind eye to a substantial amount of streaming fraud taking place on its platform, because the increase in total streams caused by Bot Accounts increased Spotify's potential ad revenue.

117.   Spotify's misrepresentations were material to Plaintiff and members of the Class because their monthly royalty payments depend on Spotify's commitment to root out fraud.

118.   Defendants' conduct also constitutes a violation of the "unfair" prong. Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.  Any justification for Defendants' practices is outweighed by the consequences and harm to Plaintiff and the Class.

119.   There were reasonable alternatives available to Defendants to further

Defendants' legitimate business interests, other than the conduct described herein.

120.    By violating the UCL, based on the allegations herein, Defendants prevented Plaintiff and members of the Class from obtaining the full extent of their duly earned streaming revenues.  Had Plaintiff and members of the Class known that Defendants were engaging in this wrongful conduct, they would have taken actions likely resulting in an end to the scheme, as well as some form of restitution.

121.    Defendants' conduct caused, and continues to cause, financial injury to Plaintiff and members of the Class in the diminution of their streaming revenue shares caused by the rampant streaming fraud taking place on Spotify.

122.    Defendants have thus engaged in unfair and fraudulent business acts entitling Plaintiff and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief, including restitution to reimburse them for the amounts they were deprived as a result of the streaming fraud described above.

123.    Additionally, under Business and Professions Code section 17203, Plaintiff and members of the Class seek an order requiring Defendants to immediately cease such acts of unfair and fraudulent business practices, and requiring Defendants to correct their actions.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.    Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2.    Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

3.    Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4.    Awarding restitution and disgorgement of Defendants' revenues and/or

profits to Plaintiff and members of the Class;

5.    Awarding declaratory and injunctive relief as permitted by law or equity, including: directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

6.    Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

7.    Awarding Plaintiff and members of the class punitive damages;

8.    Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.    For such other and further relief as the Court deems just and proper.

Dated:  November 2, 2025        BARON & BUDD, P.C.

                    By:  */s/ Mark Pifko*
                         Mark Pifko

Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Peter Klausner (SBN 271902)
pklausner@baronbudd.com
Baron & Budd, P.C.
15910 Ventura Boulevard, Suite 1600
Los Angeles, California  91436
Telephone:  (818) 839-2333

Anthony Irpino
airpino@irpinolaw.com
Pearl Robertson
probertson@irpinolaw.com
Irpino Law Firm, LLC
2216 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 525-1500

Attorneys for Plaintiff Eric Dwayne Collins, individually, and on behalf of other members of the general public similarly situated

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial of their claims by jury to the extent authorized by law.

Dated:  November 2, 2025                    BARON & BUDD, P.C.

By:  */s/ Mark Pifko*
     Mark Pifko

     Daniel Alberstone (SBN 105275)
     dalberstone@baronbudd.com
     Mark Pifko (SBN 228412)
     mpifko@baronbudd.com
     Peter Klausner (SBN 271902)
     pklausner@baronbudd.com
     Baron & Budd, P.C.
     15910 Ventura Boulevard, Suite 1600
     Los Angeles, California  91436
     Telephone:  (818) 839-2333

     Anthony Irpino
     airpino@irpinolaw.com
     Pearl Robertson
     probertson@irpinolaw.com
     Irpino Law Firm, LLC
     2216 Magazine Street
     New Orleans, Louisiana  70130
     Telephone:  (504) 525-1500

     Attorneys for Plaintiff Eric Dwayne Collins,
     individually, and on behalf of other members of
     the general public similarly situated