Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Peter Klausner (SBN 271902)
pklausner@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Los Angeles, California  91436
Telephone:  (818) 839-2333

Anthony Irpino (*pro hac vice* to be filed)
airpino@irpinolaw.com
Pearl Robertson (*pro hac vice* to be filed)
probertson@irpinolaw.com
Irpino Law Firm, LLC
2216 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 525-1500

Attorneys for Plaintiff
ERIC DWAYNE COLLINS a/k/a "RBX,"
individually, and on behalf of other
members of the general public similarly
situated

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC DWAYNE COLLINS a/k/a "RBX," individually, and on behalf of other members of the general public similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SPOTIFY USA, INC., <br><br> Defendant. | Case Number:  2:25-cv-10525-JLS-JDE <br> **CLASS ACTION** <br><br> **FIRST AMENDED COMPLAINT** <br><br> **Jury Trial Demanded** |

For his first amended complaint against Defendant SPOTIFY USA, INC.[1] ("Spotify," or "Defendant"), Plaintiff ERIC DWAYNE COLLINS a/k/a "RBX" ("Plaintiff"), individually, and on behalf of all other members of the general public similarly situated ("the Class"), based on information and belief, alleges as follows:

## INTRODUCTION

1.      To make it in the music business, you need a unique mix of extraordinary talent, determination, skill, and luck and once you get on top, it's even harder to stay there. Some say the music business is a "Hustle" because it's a dog-eat-dog environment and you need to think of ways to break new ground every day. The famous American journalist and author Hunter S. Thompson once said, "The music business is a cruel and shallow money trench . . . There's also a negative side."

2.      When it comes to recorded music, every month, more than a hundred thousand artists, songwriters, and producers are forced to compete for their share of a limited pool of royalty payments from Spotify. Success begets success and a higher "streamshare" means not only more money, but also placement on top ten playlists, playlists that further increase streamshare, and other promotional attention. Streamshare on Spotify is about more than royalty payments alone. Streamshare plays a significant role in an artist's career and it is critical that Spotify's calculations are accurate. For example, promoters and record labels look at streamshare as a sign of an active fanbase, and high numbers can be viewed as a sign of success, resulting in better career opportunities, partnerships, and industry deals. Spotify itself touts that discovery on Spotify can lead to "[m]ore concert tickets sold, [m]erch sales, [b]rand partnerships and sync deals." In the face of this competition, some take the Hustle too far – they resort to cheating. Every month, under Spotify's watchful eye,

[1] Plaintiff's First Amended Complaint reserves all rights against previously named defendants Spotify Technology, S.A. and Spotify A.B., consistent with the terms of the Parties' January 30, 2026, stipulation, including that "for purposes of discovery in this case, Plaintiff may seek discovery from Spotify Technology S.A. or Spotify AB as if they remained parties to the litigation." (Dkt. 37).

billions of fraudulent streams are generated from fake, illegitimate and/or illegal methods (*e.g.*, bots).

3.    As described herein, data analysis shows that billions of fraudulent streams have been generated with respect to songs of "the most streamed artist of all time," Aubrey Drake Graham, professionally known as Drake ("Drake"), among others. The streaming fraud with respect to Drake, the purported top streaming artist on Spotify, does not stand alone; however, it is a primary example of Spotify's selective enforcement of its fraudulent streaming policies.

4.    Spotify's selective enforcement of fraudulent streaming, which intentionally ignores fraud committed by certain "A-List" artists, causes massive financial harm to all other artists, songwriters, producers and other rightsholders whose proportional share is decreased as a result of fraudulent stream inflation on Spotify's platform. The scale of harm at issue in this litigation is enormous:  based on data analysis of streaming activity over a nearly 48-month period through 2025, the streaming fraud perpetuated on Spotify's platform is estimated to have diverted at least $600 million in royalties away from music rights holders, an injury that is borne by every artist on the platform, each of whom, by virtue of how Spotify pays royalties, necessarily receives a smaller share of Spotify's revenue pool as a result.

5.    Spotify publicly claims that it has policies and procedures in place to root out fraud, but its purported system is intentionally selective, ignoring obvious wide-scale fraud, such as that which occurs regarding Drake's music and others. The truth is, like the artists who compete on its site, Spotify is engaged in a hustle of its own. To satisfy constant pressure from shareholders to grow the business and increase stock prices, Spotify needs streaming data to show an ever-expanding population of users to engage on its platform. Accordingly, Spotify is all too happy to turn a blind eye to the substantial number of fake users on its platform whose activities are controlled by artificial bots to fraudulently inflate streams. The more users (including fake users) Spotify has, the more advertisements it can sell, the more profits the company can report, all of which serves to increase the purported

FIRST AMENDED COMPLAINT

value delivered to shareholders.

6.     Plaintiff is a world-renowned performer who, for decades, has used his voice to dazzle audiences across the globe. He comes forward now to use his voice for a new purpose.  Plaintiff brings this case to bring justice for his brother and sister creators and entertainers. In doing so, Plaintiff gives a voice to more than one hundred thousand rightsholders who, among other things, may be unable or too afraid to challenge Spotify, a powerful force in the music business whose failure to act has caused significant problems and great financial harm.

## **NATURE OF THE ACTION**

7.     This action is brought on behalf of Plaintiff and a similarly situated class of music recording artists, song writers, performers, and other music rights holders (collectively, the "Rights Holders")[2] who derive revenue, professional growth, opportunity, and other value from the music streaming service known as "Spotify."

8.     These Rights Holders derive revenue from having music—to which they possess mechanical and publishing royalty rights—made available to Spotify's millions of subscribers. These Rights Holders also derive career opportunities and other value from Spotify, including their rankings or status on Spotify. As stated by Spotify itself, "when you build your fanbase on Spotify, you're building an engine for your entire career."

9.     Spotify generates substantial sums of money by charging its subscribers a monthly fee, as well as by including paid-for advertisements across its services. The subscription and advertising dollars combine monthly to create a "revenue pool."

---

[2] "Rights Holders" refers to any individual or entity that owns, controls, or possesses an interest in the intellectual property rights associated with a musical work or sound recording. This includes any person or entity legally entitled to receive compensatory payments or royalties arising from the use, performance, or distribution of their work. Rights Holders may include, but are not limited to, artists, songwriters, composers, record labels, music publishers, producers, and any other parties that have obtained or retained ownership or control of the relevant rights through statutory provisions, assignments, or contractual arrangements.

FIRST AMENDED COMPLAINT

10. Spotify distributes portions of this revenue pool to individual Rights Holders on a monthly basis, based on their proportional share of total music streams for that month ("streamshare"). The more music streams for an artist's songs, the more revenue allocated to the Rights Holders for those songs.

11. Plaintiff's claims concern "streaming fraud"—the unlawful, deceptive and fraudulent practice of artificially inflating the number of instances in which music is "streamed" from Spotify through various means, including through the use of automated computer "Bots."

12. The use of Bots to artificially increase the number of music streams for certain artists increases the share of revenues allocated to those artists whose streamshare is artificially inflated, at the expense of Plaintiff and other Rights Holders whose revenue shares are diminished by this unlawful streaming fraud. A diminished streamshare ranking may also negatively impact a Rights Holders' downstream financial and career opportunities.

13. Spotify publicly represents that streaming fraud is prohibited from its service and that it takes measures to detect, prevent, and remedy such fraud. In actuality, however, Spotify deploys insufficient measures to address fraudulent streaming and selectively enforces the insufficient measures it does deploy.

14. Moreover, Spotify deliberately turns a blind eye to fraudulent streaming to certain classes of artists because Spotify benefits from the increased number of overall music streams generated by Bot accounts and other fraudulent means. For Spotify, more users and music streams means more advertising dollars, so long as the true origin of the streams remains hidden.

15. As a result of Spotify's insufficient measures, selective enforcement of those measures, and/or their turning a blind eye to the fraud that benefits it, streaming fraud is rampant, accounting for a substantial percentage of the total music streams on Spotify.

16. This fraudulent, and often bot-supported streaming dramatically and improperly increases the revenue share for a select number of artists and publishers, while

FIRST AMENDED COMPLAINT

it diminishes the shares for other Rights Holders whose music is streamed by legitimate users. In other words, by allowing this fraudulent streaming to take place, through negligence and/or willful blindness, Spotify breaches the duties it owes to Rights Holders and causes them substantial financial harm.

17. Spotify's conduct is carried out in violation of California law and the common law.

## JURISDICTION AND VENUE

18. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendant. Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendant is a citizen.

19. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

20. Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), because the Defendant transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims in this lawsuit occurred, among other places, in this District.

## PARTIES

21. Plaintiff Eric Dwayne Collins (hereinafter "Plaintiff Collins" or "Mr. Collins"), known professionally as "RBX" is an individual and recording artist residing in Long Beach, CA, and is a citizen of the State of California.

22. Defendant Spotify USA, Inc., is a Delaware corporation with headquarters in New York City. It is a digital music, podcast, and video service and it is the world's most popular audio streaming subscription service.

FIRST AMENDED COMPLAINT

23. Upon information and belief, during the relevant time period in this litigation, Spotify maintained multiple high-profile offices in the State of California, including offices located in San Francisco (initially three floors in the Warfield Building, 982 Market Street and subsequently at 465 California Street in the Financial District) and one located in Los Angeles (initially in West Hollywood and subsequently in LA's downtown Arts District). Spotify's organizational structure includes a "Content Insights team" who, among other things, is supposed to detect irregular and fraudulent streaming activity.

24. Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendant committed in connection with wrongful acts alleged, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendant.

**FACTUAL BACKGROUND**

**A. The Music Streaming Business**

25. "Music streaming services" are a particular type of online media, focused primarily on music, podcasts, and other digital media, that allow subscribers (often paid subscribers) to listen to—or "stream"—music and podcasts on demand. These streaming services typically host digital media in centralized online libraries, and subscribers can and do freely stream the content without downloading it.

26. Music streaming is big business. It's estimated that music streaming generated $46 billion dollars in revenues in 2024, with North America representing the largest market. Most streaming services offer premium, ad-free content for a fee, in contrast to a free, ad-supported version.

27. Generally, every time a song or podcast is streamed through one of these streaming services, Rights Holders are compensated with royalties. The amount of royalty payments owed varies depending on a number of factors, and is often less than one cent per

FIRST AMENDED COMPLAINT

stream, but for artists whose music is streamed by a large number of subscribers, the total revenue can be enormous.

28.   For streaming services that generate revenue depending on the number of songs downloaded or streamed, the potential revenue is limitless. The more songs streamed, the more revenue generated.

29.   Alternatively, some streaming services, such as Spotify, generate "revenue pools" from, among other things, the subscription fees paid by monthly subscribers as well as advertising revenue.  Rights holders are paid a percentage of the revenue pools based on a formulation that correlates the percentage of total streams attributable to individual rights holders against the total volume of streams for all songs. In this regard, the total revenue to be divided-up between rights holders is finite and untethered to the number of individual songs streamed.

30.   Any time a Rights Holder's share of the revenue pool increases due to increased music streams, the shares for other Rights Holders necessarily decrease. Indeed, as Drake, once explained in a legal filing, "[s]treaming and licensing is a zero-sum game."

31.   Thus, if some form of streaming fraud results in an artificial increase of certain Rights Holders' shares of the revenue pool (see below), it necessarily comes at the expense of other Rights Holders whose songs were legitimately streamed by real consumers, and whose share of the revenue pool necessarily decreases.

**B. Spotify**

32.   Spotify is the world's most popular audio streaming subscription service.  As of the end of the second quarter of 2025, Spotify reported that it had more than 696 million monthly active users, with 268 million premium subscribers.

33.   Spotify pays music companies, artists, and other rights holders for the right to license songs so it can play them on its streaming and subscription platforms. In 2023 alone, Spotify paid more than $9 billion in royalties to music labels and producers.

34.   Spotify provides both premium, ad-free subscriptions for which subscribers pay a monthly fee, as well as free, ad-supported subscriptions.

FIRST AMENDED COMPLAINT

35.     Streaming subscriptions are essential to Spotify's bottom-line, as they, along with advertisements, are the primary source of Spotify's revenue.

### 1. Monthly Active Users Are Critical to Spotify's Revenue and Value

36.     Like many music streaming services, Spotify relies on metrics such as "Total Monthly Active Users" ("MAUs") to forecast company success and market to investors and advertisers. The higher the number of MAUs, the more Spotify can charge advertisers to deploy ads across its service.  The same is true for the number of total music streams—the higher the number of individual streams, the more Spotify can charge advertisers.

37.     Illustrating the significance of MAUs to its business, in its securities filing statements to investors, Spotify touts that it is "the world's most popular audio streaming subscription service." In its July 2025 Form 6-K U.S. Securities and Exchange Commission ("SEC") filing, Spotify further states, "[w]ith a presence in 184 countries and territories, our platform includes 696 million monthly active users ("MAUs"), including 276 million Premium Subscribers . . . as of June 30, 2025."[3]

38.     Also, in its July 2025 Form 6-K SEC filing, under the heading, "Key Performance Indicators," Spotify emphasizes the significance of MAUs, stating "[w]e track MAUs as an indicator of the size of the audience engaged with our Service."[4]  Indeed, Spotify expressly acknowledges the connection between MAUs and its financial success – stating that "[w]e invest heavily in research and development in order to drive user engagement and customer satisfaction on our platform, which we believe helps drive organic growth in MAUs, which, in turn, drives additional growth in, and better retention of, Premium Subscribers, as well as increased advertising opportunities to our users."[5]

---

[3] https://s29.q4cdn.com/175625835/files/doc_financials/2025/q2/Q2-25-Form-6K.pdf at p. 28.

[4] *Id*. at p. 29.

[5] *Id*. at p. 31.

FIRST AMENDED COMPLAINT

39. Further Illustrating the significance of MAUs as well as user growth to the company's value, Spotify represents to investors that "[o]ur 696 million MAUs have grown 11% year-over-year, as of June 30, 2025."[6]

40. Moreover, Spotify recognizes the materiality of identifying real users and further states, "we strive to detect and minimize non-bona fide accounts that may typically be created in an attempt to artificially stream content, they may contribute, from time to time, to an overstatement in our reported MAUs."[7]

41. Rather than paying rights holders for each and every individual music stream, Spotify collects money from monthly subscribers and advertisers and pays rights holders a share of the resulting revenue pool, based on the rights holders' share of music streams attributable to their music.

### 2. By its Own Admission, Spotify's Streaming Data Provides More to Artists than Royalty Revenue Alone; it Serves as "an engine for [an artist's] entire career"

42. Spotify controls more than streaming revenue and monthly royalty payment. Spotify is an anchor to artists' entire music careers. Spotify's streamshare calculations have independent significance apart from the royalty payments alone. Spotify's streamshare calculations provide a statistical measure of an artists' overall value in the music community.

43. For example, streamshare calculations show an artist's popularity and success in the overall universe of music. Streamshare calculations show an artist's value within a particular genre (e.g., top 10 R&B artist; top 10 classical artist). Streamshare calculations also show an artist's trajectory towards success. For example, the total streamshare might not be independently high, but a growth trend is indicative of future success.

44. The above metrics derived from Spotify's streamshare are used for other decisions concerning an artist's career, including, for example, the following: Will the artist

---

[6] *Id*. at p. 28.

[7] *Id*. at p. 29.

be selected to headline a tour?  Will an up-and-coming artist be selected to open for a larger act on a tour? Will industry tastemakers and business leaders put financial resources to support an artist's growth?

45.    Streamshare calculations are relevant to other music industry investments that make or break an artist's career, including, for example, the following: Will industry leaders partner an up-and-coming artist with a high-profile producer to push their success to a higher level?  Will industry leaders decide to partner an artist with PR professionals, stylists and other collateral professionals?

46.    Finally, Streamshare is relevant to whether an artist will secure licensing deals with top brands, placement in TV and film soundtracks, and other partnerships.

47.     Spotify itself touts the fact that its streamshare calculations have independent significance to artists' careers. For example, Spotify has publicly made the following representations:

- "[M]ore artists are succeeding now than ever before.  The royalty pool keeps growing, and so does the number of artists building sustainable careers from their music."

- "Streaming has fundamentally changed the music ecosystem, lowing barriers to entry for artists of all levels and democratizing access to audio for listeners across the world.  Artists no longer need to be superstars with access to big budgets or powerful gatekeepers to create, distribute, and amplify their music globally."

- "Artists who would have struggled to break through before are now finding their audiences and building careers, no matter where they're from or what language they sing in."

48.    In sum, Spotify states that it is "focused on creating real opportunities for artists who are pursing this [a music career] professionally," and that "when you build your fanbase on Spotify, you're building an engine for your entire career."

FIRST AMENDED COMPLAINT

49.     In light of the above, when Spotify fails to address streaming fraud, the harm suffered by artists is more than just lost royalty revenue, it can harm an artist's entire career, depriving them of opportunities, collateral revenue, and their overall stature in the music community.

**C. Smaller and Independent Artists are Particularly Vulnerable Under Current Recording Industry Dynamics where Record Labels May Have a Conflict of Interest in Enforcing Equitable Policing of Fraudulent Streaming**

50.     Spotify streams the music of more than just major stars. As stated above, Spotify also markets to smaller artists who may have only a thousand monthly listeners or fewer.[8] These artists account for 80% of the 12 million artists on Spotify.[9] In fact, 78.4% of all Spotify artists in 2022 had under 50 monthly listeners.[10] Without these smaller artists, Spotify would have a much smaller pool of music and could potentially lose many MAUs.

51.     Artists like Drake, who have the highest number of listeners, receive the most royalty payments from Spotify. For example, Ariana Grande has reportedly earned hundreds of millions over her career from streaming and related revenue.[11] However, smaller artists, who make up the vast majority of artists on the platform, often receive as little as pennies to a few dollars a month.[12]

52.     Despite the diminutive amounts Spotify pays smaller and independent artists, the latter have no choice but to upload their music onto the platform because of its universal presence in the music industry and outsized market share. According to a recent news article, Spotify accounts for over 31% of the total global market share, with a reported 751

---

[8] A Case Study: How Spotify Exploits the Small Artists it Stands On, *available at* https://theunisverse.com/3108/news/a-case-study-how-spotify-exploits-the-small-artists-it-stands-on/ (last visited July 12, 2026).

[9] *Id*.

[10] *Id*.

[11] *Id*.

[12] *Id*.

million users and 290 million subscribers in more than 184 markets.[13] Accordingly, given Spotify's outsized leverage in the music industry, smaller and independent artists are particularly vulnerable to Spotify's selective enforcement of its streaming fraud policies as it diminishes already small amounts of revenue earned by this class of Rights Holders who may have little to no leverage to take on the streaming giant. Indeed, when in 2022, a Member of the United States House of Representatives introduced a resolution aimed at revising the music industry's streaming royalty program, the legislation noted that Spotify earned over $10 trillion in revenue in 2020 despite meager artist payouts.[14]

53.    Even artists whose content is owned by record labels, who in turn license the streaming rights to Spotify, are vulnerable to Spotify's selective streaming practice and may have no recourse to enforce the equitable application of Spotify's fraudulent streaming policies. Indeed, it has long been reported that major record labels own a substantial share of equity in Spotify,[15] with some news outlets reporting that major record labels may own as much as an 18% equity stake in Spotify.[16] Under such a framework, Record Labels may have a conflict of interest in advocating for stronger if not more equitable fraudulent streaming protocols, which could cause a substantial reduction in reported MAUs, and thereby diminish Spotify's stock price.

---

[13] *See* Spotify just released your all-time listening stats, top songs: Here's how to view it, *available at https://wgntv.com/news/spotify-just-released-your-all-time-listening-stats-top-songs-heres-how-to-view-it/* (last visited July 12, 2026).

[14] *See* https://www.congress.gov/bill/117th-congress/house-concurrent-resolution/102/text.

[15] Spotify's Secret Big-Label Deals: When Even Lady Gaga Can't Get a Fair Shake, Transparency is Music's Only Hope, *available at* https://www.salon.com/2015/06/02/spotifys_secret_big_label_deals_when_even_lady_gaga_cant_get_a_fair_shake_transparency_is_musics_only_hope/ (last visited July 12, 2026).

[16] Behind the Music: The Real Reason why the Major Labels Love Spotify, *available at* https://www.theguardian.com/music/musicblog/2009/aug/17/major-labels-spotify (last visited July 12, 2026).

54.     Moreover, Record Labels may be reluctant to advocate for more impartial fraudulent streaming practices if it may put them at odds with their A-list clients. Plaintiff notes that his instant claims are not the only allegations that Spotify's business practices unfairly favor record labels to the detriment of smaller and independent artists. Indeed, a recent lawsuit claims that Spotify recommends to its subscribers and listeners content from the highest-paying labels and artists through its "Discovery" Mode.[17]

55.     Accordingly, Plaintiff and other potential class members are particularly vulnerable to Spotify's unfair business practices outlined herein, where record labels may have a conflict of interest in attempting to force Spotify to apply its fraudulent streaming policies impartially on behalf of the artists who license their rights to such record labels, and where smaller and independent artists lack the resources or leverage to do so.

**D. Streaming Fraud**

56.     For several years, certain bad actors have engaged in "streaming fraud," whereby music streams are artificially and fraudulently increased for certain artists in order to increase the revenue share for the Rights Holders of those artists, thereby capturing ill-gotten music royalties that would otherwise be owed to other Rights Holders whose own revenue shares have been diminished by the fraud.

57.     Often times, streaming fraud is carried out by deploying "Bots," which are automated software programs that run scripts to perform repetitive tasks on the internet at high speeds. In the context of streaming fraud, large numbers of Bots are programmed to repeatedly and continuously stream certain songs, thereby fraudulently inflating the total number of streams for that music. These Bots are often purchased, deployed, or coordinated by third parties for the purpose of manipulating streaming metrics. The use of such Bots creates the false appearance of heightened popularity for specific artists or recordings and inflates the total number of reported streams on the platform.

---

[17] *Spotify Sued Over Discovery Mode: 'A Modern Form of Payola,'* *available at* https://www.billboard.com/pro/spotify-lawsuit-discovery-mode-modern-payola/ (last visited July 12, 2026).

13

FIRST AMENDED COMPLAINT

58.     Often times, those engaged in streaming fraud employ "Bot Vendors" who are specialized tech and software companies that build and deploy Bots on the internet.

59.     Bot Vendors typically design Bots to mimic human behavior and resemble real social media or streaming accounts in order to avoid detection. Bot Vendors also use Virtual Private Networks (hereinafter "VPNs") which are encrypted internet connections that protect privacy and data, in part, by obscuring the physical location of the internet user. Through a series of technical devices, Bot Vendors use VPNs to obscure the true location of the Bot Accounts, making it appear as though the Bots are streaming music from all over the world, when in reality the Bot Accounts all originate from a small number of locations (in some cases a singular location), and from areas that lack the population to support a high volume of streams.

60.     There is no limit to the number of Bots that can be deployed, particularly on Spotify whose platform does not require a credit card to establish an account. Bot Vendors can utilize thousands, and in some cases, many more Bots at any one time.

61.     The use of Bots is supposedly prohibited on all major music platforms, including Spotify, as they can result in a distortion of those services' finite revenue pools, and in so doing, distort the revenue shares owed to artists and Rights Holders whose music is being streamed by legitimate users.

62.     Plaintiff is informed and believes that Spotify knew or should have known, with reasonable diligence, that fraudulent activities were occurring on its platform.

**E. Spotify's Fraudulent Misrepresentations and Omissions**

63.     Spotify expressly represents that the use of Bots—and all other forms of streaming fraud—on its platform is prohibited. Spotify acknowledges that such conduct compromises the integrity of its platform, misrepresents listener engagement metrics, and results in the improper allocation of royalty payments.[18]

64.     Spotify also represents that it deploys methods to detect, prevent, and remedy

---

[18] https://support.spotify.com/us/artists/article/track-monetization-eligibility/

FIRST AMENDED COMPLAINT

streaming fraud on its platform. In November 2023, Spotify publicly (and belatedly) announced its intention to implement a series of new policies designed to protect and strengthen the integrity of its music royalty ecosystem for both emerging and professional artists. Today, on its website, Spotify claims, "We put significant engineering resources and research into detecting, mitigating, and removing artificial streaming activity on Spotify so that nothing stands in the way of our mission of giving artists the opportunity to live off their art, and so that artists, songwriters, and rights holders are paid as fairly as possible for their work."[19] Further, "As part of these efforts, we conduct daily cleaning to ensure artificial streams are removed from public numbers in the Spotify app. This is essential to ensure a level playing field, where nobody is able to use artificial streaming to increase the perceived popularity of their music on Spotify." *Id.*

65.    The negligently overdue November 2023 announcement was followed by the negligently insufficient and/or overdue implementation of new policies beginning April 2024. Pursuant to these policies, tracks must achieve a minimum threshold of at least 1,000 streams within the preceding twelve months to qualify for inclusion in the recorded music royalty pool calculation. Spotify has characterized this change as a necessary measure to ensure that royalties are distributed only for tracks that demonstrate a minimal level of genuine listener engagement. Spotify further stated that it believes this policy "will eliminate one strategy used to attempt to game the system or hide artificial streaming, as uploaders will no longer be able to generate pennies from an extremely high volume of tracks."

66.    In addition to the stream threshold requirement, Spotify also requires that each track be streamed by a minimum number of unique listeners before becoming eligible for royalty consideration. This requirement is intended to prevent users from artificially inflating eligibility through repeated or automated streaming activity. Spotify does not publicly disclose the specific listener threshold, asserting that nondisclosure is necessary to

---

[19] https://support.spotify.com/us/artists/article/third-party-services-that-guarantee-streams/

deter manipulation of the system by bad actors.

67. Spotify has further represented that, belatedly beginning in early 2025, it will impose financial penalties on labels and distributors in the form of per-track charges when "flagrant" artificial streaming activity is detected on their content.

68. Through these representations and policy statements, Spotify has repeatedly conveyed that it maintains both the capability and commitment to detect and address fraudulent streaming activity. Spotify's communications are intended to assure the public, its advertisers, and everyone in the music industry that the company exercises reasonable diligence in monitoring its platform and enforcing its stated anti-fraud policies.

69. However, despite these assurances, multiple instances of artificial streaming activity have continued to occur and persist on Spotify's platform. The ongoing existence of such activity shows that Spotify's detection mechanisms and enforcement policies are ineffective, inconsistently applied, and/or insufficient to prevent or eliminate the manipulation of royalty distributions.

70. Indeed, Spotify failed to disclose, actively concealed, and omitted from all public representations referenced in this First Amended Complaint material facts that were within Spotify's exclusive knowledge and were not known or reasonably accessible to Plaintiff; that it is, that Spotify does not apply its anti-fraud policies evenhandedly and that Spotify only enforces them selectively when it benefits Spotify. For example, Spotify rigorously polices the low end of its streaming platform, where enforcement costs Spotify nothing and in fact, benefits its bottom line by imposing minimum-stream and unique listener thresholds that strip royalties from emerging and independent artists. Spotify declares that these measures "eliminate one strategy used to attempt to game the system" by preventing "uploaders" from "generat[ing] pennies from an extremely high volume of tracks," and levies per-track financial penalties on labels and distributors for "flagrant" artificial streaming.

71. Yet, at the same time, Spotify declines to apply that same scrutiny to artificial streaming that inflates the catalogs of its highest-volume, "A-list," most lucrative artists

FIRST AMENDED COMPLAINT

such as Drake, the very accounts whose streams drive Spotify's reported monthly active users, engagement metrics, and advertising revenue.

72. In this respect, Spotify's public statements regarding its fraudulent streaming protocols were only partial representations and were misleading because Spotify failed to disclose that it selectively enforced its fraudulent streaming protocols, as detailed in this First Amended Complaint.

73. Under a properly functioning system, when Spotify knows or should know that music streams for a particular song have been artificially and fraudulently inflated, through the use of Bots or otherwise, Spotify cannot credit those fraudulent streams to the revenue share owed to the Rights Holders for those songs. However, that is not what Spotify does.

**F. Music Streams of Drake's Music are Artificially Boosted by Bots**

74. Drake is a well-known singer/songwriter whose music is available for streaming on Spotify. In fact, Drake is purportedly the most streamed artist of all time on the platform. In September 2025, Drake became the first artist to nominally achieve 120 billion total streams on Spotify.

75. On Spotify, Drake is not simply one artist. Drake is one of the most commercially significant recording artists in the world, with a steamshare that purportedly dwarfs every other artist. He has, for at least the past three years, ranked as the single most-streamed global artist of the year on Spotify.

76. Drake's catalog so dominates Spotify's platform that he alone accounts for an outsized share of all streams on Spotify (his "streamshare"), far exceeding that of any other artist. Precisely because Drake's streaming volume overshadows that of every other artist, the fraudulent inflation of his streams alone, even though he is just a single artist, has a massive, platform-wide effect on the allocation of Spotify's finite revenue pool, diverting royalties from other Rights Holders on a scale that the manipulation of an ordinary artist's streams could not approach.

77. However, on information and belief, there is voluminous information, of which Spotify knows or should know, showing that between a 48-month period through

FIRST AMENDED COMPLAINT

2025, a substantial, non-trivial percentage of Drake's approximately 37,000,000,000 streams on Spotify during that timeframe were inauthentic and appeared to be the work of a sprawling network of Bot Accounts. The fraudulent activity was not evenly distributed over time, peaking in or around October and November 2023, coinciding with the release of certain of Drake's albums. Plaintiff is informed and believes that this conduct is ongoing and continues into the present. The 48-month period is simply a sampling period used to identify the scope and nature of some of the fraud.

78.    Plaintiff is informed and believes that an examination of Drake's music streams reveals abnormal VPN usage, seemingly designed to obscure the true geographic origins of the Bot Accounts that were streaming his songs.  This abnormal VPN usage is inconsistent with genuine human listening and reflects fraudulent streaming.

79.    For example, Plaintiff is informed and believes that over a four-day period in 2024, at least 250,000 streams of Drake's song "No Face" originated in Turkey, but were falsely geomapped through the coordinated use of VPNs to the United Kingdom in an attempt to obscure their origins.

80.    Further, Plaintiff is informed and believes that a large percentage of the accounts streaming Drake's music were geographically concentrated around areas whose populations could not support the volume of streams emanating therefrom. In some cases, massive amounts of music streams, more than a hundred million streams, originated in areas with *zero residential addresses*.

81.    Moreover, Plaintiff is informed and believes that, Geohash data shows that nearly 10% of Drake's streams come from users whose location data showed that they traveled a minimum of 15,000 kilometers in a month, moved to unreasonable locations between songs (consecutive plays separated by mere seconds but spanning thousands of kilometers), including more than 500 kilometers between songs (roughly the distance from New York City to Pittsburgh).

82.    Also, Plaintiff is informed and believes that between January 2022 and September 2025, the volume and timing of the music streams for Drake's music failed to

follow typical, established streaming patterns. While most songs and/or albums see an initial spike in streaming immediately upon release, those same songs/albums typically follow a predictable decay pattern over the following months.[20] However, in many instances, the streams of Drake's music on Spotify saw significant and irregular uptick months—and in some cases years—after the release of his songs, with no reasonable explanations for those upticks other than streaming fraud. In other instances, Drake's decay rate was slower and less dramatic when compared to those of his contemporaries. Tellingly, the independent spikes in anomalous user-behavior data and in anomalous geography and VPN data peaked at the same time, in or around November 2023.

83. Additionally, the number of streams of Drake's music attributable to individual accounts is staggering and irregular. For instance, Plaintiff is informed and believes that while the average Spotify listener listens to 10 songs per day, a massive amount of the accounts listening to Drake's music (Drake's "users") listened *exclusively to Drake's music for 23 hours a day*.

84. Plaintiff is informed and believes that streaming data of Drake's music shows that less than 2% of his users accounts for roughly 15% of his overall streams. And roughly 9% of his streams are attributable to less than 1% of his users. As a result, Drake's music accumulated far higher total streams compared to other highly-streamed artists, even though those artists had far more "users" than Drake.

85. Despite Drake consistently being Spotify's top artist by streamshare, his touring data does not align with his purported popularity. On information and belief, Drake's shows on each of his tours averaged 11,500 to 16,7000 tickets sold per show, except for his first tour, which averaged about 3,700 tickets sold per show. For context, these numbers cannot fill the average stadium. Other comparably popular hip hop artists with markedly lower Spotify streamshare averaged 35,000 to 100,000 tickets sold per show.

---

[20] This decay pattern is often referred to as the "decay rate."

FIRST AMENDED COMPLAINT

86.    As a result of the fraudulent streaming scheme described above, with respect to Drake's music, the Rights Holders of Drake's music (Drake and his company, Frozen Moments, LLC) saw their shares of the revenue pool substantially and artificially increased. This generated significant revenues for Drake and Frozen Moments, LLC, all at the expense of other Rights Holders whose shares and revenues were greatly diminished.

87.    The amount of streaming revenue that would otherwise have been distributed to legitimate Rights Holders but for the fraudulent boosting of Drake's music is estimated to be—for a 48-month period through 2025—approximately $600 million.

88.    Because Spotify's revenue pool is finite, this diversion harms every Rights Holder on the platform. The impact on small and mid-sized Rights Holders is particularly detrimental. An independent artist who might otherwise earn only a few thousand to several tens of thousands of dollars per year from Spotify can reasonably be estimated to lose a meaningful percentage of that income annually because every fraudulent stream credited to a manipulated catalog proportionally reduces the royalty share paid to every other Rights Holder.

89.    Spotify knew or should have known about the anomalies described above had Spotify employed reasonable detection measures. These artificial and inauthentic streams were readily identifiable to Spotify in light of their statistically improbable geohashing, sudden surges in stream counts, coordinated streaming patterns, and uniquely slow and shallow decay of streaming of songs.

90.    But to date, Spotify has never properly addressed the hundreds of millions—if not billions—of fraudulent and artificial music streams attributed to Drake's music, and the ill-gotten revenues from those streams have never been properly distributed among the other Rights Holders to whom the revenue is owed.

**G. Other Examples of Spotify's Selective Enforcement of its Fraudulent Streaming Protocols**

91.    Drake is not the only artist whose fraudulent streams Spotify selectively fails to enforce. For example, upon information and belief, Artist A also exhibited decay rates

FIRST AMENDED COMPLAINT

similar to Drake's and that are indicative of fraudulent streaming boosted by bot-activity. Indeed, within the same 6-month period, one album released by Artist A, years after its original release, exhibited a slower decay rate than a new album released by Taylor Swift. Such anomalous decay rates, like those exhibited by Artirst A and Drake, are indicative of fraudulent streaming.

92.    Upon information and belief, the artificial streaming fraud is not limited to Drake and Artist A and continued analysis is likely to identify additional artists whose streams have been similarly artificially inflated; with Spotify turning a blind eye to such inflation.

93.    As another example of when Spotify selectively enforces its fraudulent streaming protocols only when it benefits Spotify, Spotify in fact has weaponized its fraudulent streaming data capabilities.

94.    When Spotify was sued by an independent artist in *Sosa Entertainment, LLC, v. Spotify et. al.*, Civil Action No. 2:19-cv-00843 (M.D. Fla.), Spotify filed a counterclaim and third-party complaint against the independent artist claiming that the Plaintiff in that case "designed a scheme to artificially generate hundreds of millions of fraudulent streams on songs he had seeded on Spotify's online-streaming service."[21]

95.    Although Spotify had ignored the obvious streaming fraud prior to it being sued by Sosa Entertainment, in response to the lawsuit, Spotify galvanized its data capabilities, marshalling its Content Insights team's capabilities to allege the following evidence of that independent-artist-plaintiff's fraudulent streaming scheme: (1) highly irregular sudden spikes of streams to the artist's content; (2) that 99% of streams came from Spotify's ad-supported service; and (3) evidence that the artist was utilizing bot-farmers to artificially stream that artist's content.

---

[21] *See Sosa Entertainment, LLC, v. Spotify et. al.*, Dkt. No. 33, at 26, Civil Action No. 2:19-cv-00843 (M.D. Fla. May 18, 2020).

96.     Even though Drake's music, as outlined above, displayed the similar, if not identical, characteristics, Spotify has never sued Drake for the same fraudulent streaming scheme let alone taken any action to remove the fraudulent streams from its platform.

97.     In short, when it comes to a marque artist like Drake whose massive bot-driven user base drives Spotify's value, Spotify ignores obvious signs of fraud. In contrast, when it comes to an independent artist whose streaming volume is relatively low, Spotify leveraged its Content Insights team's capabilities in an adversarial legal action, employing the very same metrics at issue in this litigation.

98.     As another example, more recently, Spotify adjusted its charts and culled over 500,000 artificial streams from its platform but only after it was publicly rebuked by a top Kalshi cultural market trader and to avoid the reputational harm caused by the public disclosure of rampant streaming fraud on its platform.[22] Indeed, when the song "Earrings" by the artist Malcom Todd surged to number one on Spotify recently, Davies called out Spotify for the perceived use of botting that was artificially inflating the song's streaming numbers. Spotify's culling of the fraudulent streams dropped the song from first to fourth on its charts.[23]

99.     The above examples are evidence that buttress Plaintiff's allegations set forth herein, which are further supported upon information and belief, that Spotify has an internal policy that it selectively enforces its fraudulently streaming protocols only when it benefits Spotify's bottom-line.

**H. Spotify's Failure to Prevent Streaming Fraud**

100.    At all times relevant to the allegations contained herein, Spotify was one of the easiest platforms to defraud using Bots due to its negligent, lax, and/or non-existent—Bot-related security measures.

---

[22] *See* Spotify Confirms Streaming Fraud After Kalshi Trader Cries Foul, *available at* https://www.wired.com/story/spotify-streaming-manipulation-prediction-markets-polymarket-kalshi/ (last visited July 7, 2026).

[23] *Id.*



101.    For instance, Spotify offers a free, ad-supported version of its streaming service, which does not require the use of a valid credit card to sign up. This creates the ideal conditions for fraudulent Bot Accounts to create fake Spotify accounts, since Bots do not possess valid credit card numbers, and/or not in the volume required for meaningful, Bot-supported streaming fraud.

102.    And Spotify has an incentive for turning a blind eye to the blatant streaming fraud occurring on its service. Spotify derived revenue, in part, from advertising. The higher the volume of individual streams, the more Spotify could charge for ads. By properly

detecting or removing fraudulent streams from its service, Spotify would lose significant advertising revenue.

103.   Spotify's efforts to implement countermeasures appear to be deliberately and selectively enforced and, at a minimum, have systemically failed over at least the past four years, to prevent, detect, or remove the reporting of (and allocation of streamer revenue based upon) billions of inauthentic streams.

104.   Ultimately, through negligence and/or willful blindness, Spotify failed to maintain platform integrity and failed to prevent the use of artificial Bot streaming to inflate the number of streams reported for various artists, including, but not limited to, Drake.

105.   Moreover, by representing to Rights Holders and others that Spotify employs active measures to detect, prevent, and remedy streaming fraud, and by not revealing the stark reality that streaming fraud continues to surge on its platform and that Spotify selectively enforces its fraudulent streaming protocols, Spotify conceals from Rights Holders both the enormity of this problem, and its detrimental financial impact to Rights Holders.

106.   Spotify's concealment was not limited to the mere existence and magnitude of the fraud. Spotify also failed to disclose that it enforces its anti-fraud policies selectively against emerging and independent artists at the bottom of the platform, while declining to remove the artificial streams that inflate the catalogs of its high-volume, most profitable artists. That omission was material.

107.   A reasonable Rights Holder, including Plaintiff, would consider it important to know that Spotify's touted anti-fraud measures are applied in a one-sided manner that systematically operates to those Rights Holders financial detriment, and Spotify had a duty to disclose this fact because it had exclusive knowledge of how it applied its policies and the streaming data underlying them, because it made affirmative representations that it polices fraud "so that nothing stands in the way" of artists being "paid as fairly as possible," and because those partial representations were misleading absent disclosure of its selective enforcement. By representing that it evenhandedly protects the integrity of its music royalty

FIRST AMENDED COMPLAINT

ecosystem, while omitting that it selectively declines to police the fraud that most benefits Spotify, it created a false impression that it was safeguarding all Rights Holders equally.

## TOLLING OF THE STATUE OF LIMITATIONS

108.   Any applicable statutes of limitations have been tolled by Spotify's knowing and active concealment, and misleading actions, as alleged herein.  Plaintiff and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiff and members of the Class could not reasonably have discovered the true nature of the Defendant's wrongful conduct any earlier.

109.   Spotify knowingly, affirmatively, and actively concealed the true character, quality, and nature of the streaming fraud occurring on its platform from Plaintiff and members of the Class by falsely claiming that the problem was being addressed and remedied. Based on the foregoing, Defendant is estopped from relying on any statutes of limitation as a defense in this action.

110.   The causes of action alleged herein did or will only accrue upon discovery of the true nature of the wrongful conduct, as a result of Defendant's fraudulent concealment of material facts. Plaintiff and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful conduct alleged herein.

## PLAINTIFF LACKS AN ADEQUATE LEGAL REMEDY

111.   As described above, Plaintiff suffered an actual and imminent threat of future harm that cannot be adequately cured with monetary damages. For this harm, Plaintiff lacks an adequate remedy at law and requires injunctive relief.

112.   Defendant's misconduct is ongoing and prospective in nature. Defendant continues to allow fraudulent streaming to occur on its platform and uses that fraudulent streaming data to determine revenue share payments. Only an injunction can provide prospective relief that stops the fraudulent conduct. Monetary damages alone cannot accomplish this.

113.  Plaintiff also seeks legal damages and, alternatively, restitution. Plaintiff seeks restitution in the alternative because he lacks an adequate remedy at law.

114.  A legal remedy is not adequate if it is not as certain as an equitable remedy. To obtain legal damages on a negligence theory of liability, Plaintiff must show that he had a special relationship with either Spotify or the fraudulent streamers, or that Spotify voluntarily undertook to protect artists from streaming fraud such that a legal duty existed. Plaintiff can seek restitution without making this showing. Plaintiff's negligence claim is therefore less certain than his UCL claim.

115.  Finally, the remedies at law are not equally prompt or efficient as equitable remedies. The need to schedule a jury trial will certainly result in delay and additional expenses than the bench trial required for Plaintiff's UCL claim.

## PLAINTIFF'S CLAIMS AGAINST DEFENDANTS

### PLAINTIFF ERIC DWAYNE COLLINS

116.  Plaintiff Eric Dwayne Collins, known professionally as "RBX," is an American rapper and recording artist who currently resides in Long Beach, CA. He is widely recognized for his distinctive voice and influential lyrical contributions to the foundation of West Coast hip-hop. RBX first gained popularity through his appearances on Dr. Dre's 1992 triple-platinum album *The Chronic* and Snoop Doggy Dogg's 1993 debut album *Doggystyle*, which has sold more than 11 million copies worldwide.

117.  Plaintiff Collins has also released multiple solo albums, including his 1999 debut *The RBX Files*, which achieved Gold certification, as well as *No Mercy, No Remorse* (1999) and *The Shining* (2004). His solo catalog further established him as a key contributor to the evolution of the West Coast rap sound.

118.  Building on his early success, RBX has continued to collaborate with numerous multi-platinum artists throughout his career, appearing on Eminem's *The Marshall Mathers LP* (11× Platinum), Kris Kross's *Da Bomb* (Platinum), and Warren G's *I Want It All* (Gold).

119. RBX possesses royalty rights in a range of notable and commercially successful songs and albums, including *The Day the Niggaz Took Over, High Powered, Let Me Ride, Lyrical Gangbang, Stranded on Death Row, The Roach, Rat-Tat-Tat-Tat, Fuck With Dre Day, Remember Me, Serial Killa, Sound of My Hood, and Gangsta Love.*

120. Plaintiff Collins' music, to which he owns the royalty rights, is available for streaming on Spotify. As such, he derives revenue from his share of the revenue pool, as determined by the total number of streams of his music.

121. Along with the other Rights Holders, Plaintiff Collins' share of Spotify's revenue pool has been unjustly diminished and unfairly redistributed, to his financial detriment, as a result of the artificial and inflated fraudulent streaming of the music that Spotify failed to detect, address, and/or cure.

## CLASS ACTION ALLEGATIONS

122. Plaintiff brings this action, on behalf of himself, and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

123. Plaintiff seeks to represent the following class defined as (the "Class"):

> All residents of the United States of America who, during
> the period January 1, 2018, through the present, possessed
> royalties rights for on-demand digital media content that
> was hosted by Spotify (Rights Holders), and whose
> royalties and subscription revenue shares were diminished
> as a consequence of the Defendant' wrongful conduct.

Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

124. Plaintiff reserves the right to establish additional sub-classes as appropriate.

125. This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

FIRST AMENDED COMPLAINT

126.  Numerosity:  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendant.  At this time, Plaintiff is informed and believes that the Class includes thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

127.  Ascertainability:  The identities and contact information of members of the Class are available from Defendant' records, and others can be ascertained through appropriate notice.  Notice can be provided to the members of the Class through direct mailing, electronic communications, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

128.  Typicality:  Plaintiff's claims are typical of the claims of the other members of the Class which he seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiff and each member of the Class has been subjected to the same negligent and fraudulent conduct and have been damaged in the same manner thereby.

129.  Adequacy:  Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiff is an adequate representative of the Class, because he has no interests which are adverse to the interests of the members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling and prosecuting class actions.

130.  Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)  The expense and burden of individual litigation make it economically

FIRST AMENDED COMPLAINT

unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)  If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)  Absent a class action, Defendant likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

131.  Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

132.  The common questions of fact include, but are not limited to, the following:

(a)  Whether Defendant engaged in unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200, *et seq.*;

(b)  Whether Defendant engaged in negligent conduct to the detriment of members of the class;

(c)  Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

(d)  Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

133.  In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendant;

(b)  The prosecution of separate actions by individual members of the Class

FIRST AMENDED COMPLAINT

would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)    Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

134.   Plaintiff is not aware of any difficulty, which will be encountered in the management of this litigation, which should preclude its maintenance as a class action.

**CLAIMS BROUGHT ON BEHALF OF THE CLASS AGAINST SPOTIFY**
**<u>FIRST CLAIM FOR RELIEF</u>**
**Negligence**

135.   Plaintiff incorporates by reference in this claim for relief the allegations in Paragraphs 1 to 110 and 116 to 134, with the same force and effect as though fully set forth herein.

136.   Plaintiff brings this cause of action on behalf of himself and the members of the Nationwide Class against Spotify.

137.   Spotify, as an operator of a major digital music platform, is in a special position of confidence and trust and owes a duty to maintain the integrity of its revenue allocation system.

138.   A special relationship exists between Spotify and the Rights Holders whose music Spotify hosts. Rights Holders entrust their work and the entirety of their streaming revenue interests to Spotify and depend on Spotify to protect those interests. Rights Holders do not have access to streaming data necessary to monitor, detect, or remedy fraud affecting their own royalties. Spotify holds itself out as upholding the integrity of its music royalty system and Rights Holders reasonably rely on Spotify to perform that protective role. The relationship runs to a defined and limited community, the Rights Holders whose works are

30

hosted on the platform. The relationship particularly benefits Spotify, who profits from hosting Rights Holders' works and from the streaming and advertising revenue generated on its platform.

139.    Spotify has a duty of care to the members of the class whose music it hosts through its audio streaming service, and to whom it distributes streaming revenue. That includes the duty to monitor streaming traffic, detect and/or prevent the use of prohibited Bots and/or other illegitimate means that are deployed to distort the streaming data and artificially inflate streaming numbers.

140.    Spotify also has a special relationship with the third parties who deploy Bots on its platform, because Spotify has the ability to control their conduct. The Bot Accounts exist only by Spotify's leave: Spotify creates and issues the accounts the Bots use, sets and enforces the Terms of Use and platform policies that govern all user conduct, and retains the unilateral ability to monitor, suspend, terminate, and block accounts and to decline to credit or pay out streams it identifies as artificial. Spotify represents that it exercises this control, by "conduct[ing] daily cleaning," imposing minimum stream and unique listener thresholds, and levying per-track penalties on labels and distributors for "flagrant" artificial streaming. Because Spotify registers, governs, and can terminate the very accounts through which the Bots operate, Spotify has assumed a position of control over those third parties sufficient to give rise to a duty to prevent them from harming Rights Holders.

141.    Defendant also voluntarily undertook and assumed a duty to ensure that its platform was not being surreptitiously manipulated by third parties, to the financial detriment of legitimate Rights Holders. To the extent that Plaintiff is a third party harmed by Defendant's negligent attempts to prevent streaming fraud, he asserts his negligence claim on behalf of harmed third parties. *See* Restatement (Second) of Torts §§ 323, 324A. For example, through Spotify's November 2023 announcement, its April 2024 royalty-eligibility policies, its minimum stream and unique listener requirements, its "daily cleaning" of artificial streams, and its per-track penalties for flagrant artificial streaming, Spotify affirmatively assumed the task of safeguarding the integrity of its revenue pool.

FIRST AMENDED COMPLAINT

142. Spotify has access to detailed streaming data that would and/or should have alerted Spotify to the artificial and/or Bot-supported streaming of music, had Spotify chosen to properly monitor that data and/or properly investigate potential misuses of its streaming service. Spotify could have then rectified the misuse of its services and ensured that members of the Class did not have their shares of the revenue pool diminished by the rampant streaming fraud taking place on its platform.

143. In other words, Spotify had the means to both detect and properly address the fraudulent streams.

144. Instead, Spotify breached its duty by selectively enforcing its fraudulent streaming protocols and by failing to detect, turning a blind eye to, and/or failing to properly address the artificial inflating of streaming because the increase in overall music streams allowed Spotify to generate more revenue for itself. Spotify failed to put in place adequate monitoring, detection, and/or remedial measures to identify artificial streaming. Spotify further failed to consistently and evenhandedly apply its fraudulent streaming protocols.

145. By selectively enforcing, failing to properly detect, turning a blind eye to, failing to properly address, and/or allowing fraudulent Bot Accounts to artificially inflate the number of music streams for certain music, to the detriment of other Rights Holders, Spotify created an unreasonable and foreseeable risk of harm to members of the Class.

146. By failing to properly detect, turning a blind eye to, failing to properly address, and/or allowing the above-described improper artificial inflation of streaming conduct, Spotify breached their duty of care to members of the Class by allowing Bot Accounts and/or other improper efforts to artificially, corruptly, and/or dishonestly increase the share of the revenue pool for certain artists, to the detriment of the members of the Class.

147. Spotify's failure to properly monitor its platform, delayed and/or insufficient enforcement of anti-artificial streaming policies, and/or failure to properly address the above-described fraudulent fake streaming, has allowed third parties to implement inauthentic streams to be credited and paid, causing the misallocation of royalties from the

FIRST AMENDED COMPLAINT

finite revenue pool to a select number of artists, causing injury to Plaintiff and members of the Class.

148. By allowing Bot Accounts and/or other improper methods to artificially increase certain shares of the revenue pool, the shares belonging to Plaintiff and members of the Class were diminished, and members of the Class received less money than they would have if the shares of the Bot-boosted accounts were commensurate with their percentage of legitimate music streams.

### SECOND CLAIM FOR RELIEF
**Violation of Unfair Competition Law**
**(California Business & Professions Code §§ 17200, *et seq.*)**

149. Plaintiff incorporates by reference in this claim for relief the allegations in Paragraphs 1 to 134, with the same force and effect as though fully set forth herein.

150. Plaintiff brings this cause of action on behalf of himself and the members of the Class against Spotify.

151. California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Defendant have engaged in fraudulent business acts or practices in violation of California Business and Professions Code sections 17200, *et seq*.

152. Spotify repeatedly and dishonestly represented that it would detect, prevent, and remedy streaming fraud on its platform. But Spotify never made good on these representations. Instead, Spotify turned a blind eye to a substantial amount of streaming fraud taking place on its platform, because the increase in total streams caused by Bot Accounts increased Spotify's potential ad revenue.

153. Spotify's representations were false and misleading when made. Spotify represented that it "put[s] significant engineering resources and research into detecting, mitigating, and removing artificial streaming activity," and that it "conduct[s] daily cleaning to ensure artificial streams are removed from public numbers," thereby conveying to Rights Holders that it was actually and effectively policing artificial streaming across the

FIRST AMENDED COMPLAINT

board. Plaintiffs are informed of streaming fraud of an obvious, readily detectable, and staggering magnitude, including hundreds of millions to more than a billion Bot-driven streams on a single artist's catalog, individual accounts purportedly traveling more than four times around the globe in a single month, and monthly VPN-masked streams exceeding four times the expected baseline, persists unaddressed for nearly 48 consecutive months. The persistence of fraud that is conspicuous and measurable renders Spotify's representations about the resources it devotes to, and the efficacy of, its anti-fraud efforts false and materially misleading.

154. Spotify's representations were further false and misleading because Spotify failed to disclose, actively concealed, and omitted from all public representations referenced in this First Amended Complaint material facts that were within Spotify's exclusive knowledge and were not known or reasonably accessible to Plaintiff; that it is, that Spotify does not apply its anti-fraud policies evenhandedly and that Spotify only enforces them selectively when it benefits Spotify. For example, Spotify failed to disclose, actively concealed, and omitted from its public representations about tis fraudulent streaming program that it declines to remove artificial streams that inflate the catalogs of its highest-volume and most lucrative artists. Spotify's statements about its efforts to remove fraudulent streaming from its platform, including that it polices fraud "so that nothing stands in the way" of artists being "paid as fairly as possible," amongst other public statements detailed in this First Amended Complaint, created the false impression of equitable and evenhanded enforcement of its fraudulent streaming protocols when in truth and in fact, Spotify applies its policies in a manner calculated to preserve the streams, and the resulting engagement and advertising revenue, that benefits Spotify to the detriment of Rights Holders.

155. In this respect, Spotify's public statements regarding its fraudulent streaming program were only partial representations and were misleading because Spotify failed to disclose that it selectively enforced its fraudulent streaming protocols, as detailed in this First Amended Complaint.

FIRST AMENDED COMPLAINT

156. Spotify's misrepresentations were material to Plaintiff and members of the Class because their monthly royalty payments depend on Spotify's commitment to root out fraud.

157. Spotify's misrepresentations and omissions were likewise material because they concerned whether Spotify was, in fact, enforcing its anti-fraud policies evenhandedly to protect all Rights Holders, or instead selectively declined to police the fraud that diminished the Class's royalties while benefiting Spotify. Plaintiff and members of the Class actually and reasonably relied on Spotify's representations that it detects, prevents, and remedies streaming fraud, and that it does so to ensure that artists are "paid as fairly as possible." Relying on those representations, Plaintiff and members of the Class made and kept their music available on Spotify, accepted Spotify's calculation and distribution of their streamshare-based royalties as accurate, and refrained from taking self-protective measures, such as auditing or challenging Spotify's stream counts, demanding independent verification of royalty allocations, or hosting their works elsewhere on another platform. Plaintiff and members of the Class were aware of and relied upon Spotify's anti-fraud representations in continuing to distribute ad monetize their music through Spotify. Had Plaintiff and members of the Class known that the rampant artificial streaming was not being remedied and that it selectively declined to police the fraud that most diminished their royalties, they would not have relied on Spotify's royalty allocations and would have acted to protect their revenue shares.

## THIRD CLAIM FOR RELIEF
### Violation of Unfair Competition Law
### (California Business & Professions Code §§ 17200, *et seq.*)

158. Plaintiff incorporates by reference in this claim for relief the allegations in Paragraphs 1 to 134, with the same force and effect as though fully set forth herein.

159. Defendant's conduct also constitutes a violation of the "unfair" prong. Defendant's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. Any purported justification for

FIRST AMENDED COMPLAINT

Defendant' practices is outweighed by the consequences and harm to Plaintiff and the Class.

160.    The harm to Plaintiff and the Class is substantial and concrete. As alleged above, over the nearly 48-month period analyzed, the streaming fraud perpetuated on Spotify is estimated to have diverted at least $600 million in royalties away from Rights Holders, diminishing the monthly revenue pool share of every Rights Holder on the platform, including Plaintiff.

161.    Plaintiff and the Class could not reasonably have avoided the injury, because Spotify alone controls the streaming data and the means of detecting and remedying the fraud, and because Spotify concealed the true extent of the fraud while representing publicly that it was taking measures to combat it.

162.    There were reasonable alternatives available to Defendant to further Defendant's legitimate business interests, other than the conduct described herein. Spotify had the data available to it to identify the obvious signs of fraud and had the technical infrastructure in place to halt the fraud, but as alleged above, it chose to selectively enforce and at times outright ignore streaming fraud from top artists like Drake. In comparison to the harm caused by Spotify's failure to act, the burden on Spotify to enforce measures to identify, halt and remedy streaming fraud, including simply impartially enforcing its protocols already in place, was minimal.

163.    By violating the UCL, as alleged herein, Defendant prevented Plaintiff and members of the Class from obtaining the full extent of their duly earned streaming revenues. Had Plaintiff and members of the Class known that Spotify was engaging in this wrongful conduct, they would have taken actions likely resulting in an end to the scheme, as well as some form of restitution.

164.    Relying on the belief that Spotify applied its streaming protocols efficiently and evenhandedly, Plaintiff and members of the Class made and kept their music available on Spotify, accepted Spotify's calculation and distribution of their streamshare-based royalties as accurate, and refrained from taking self-protective measures, such as auditing or challenging Spotify's stream counts, demanding independent verification of royalty

FIRST AMENDED COMPLAINT

allocations, or hosting their works elsewhere on another platform. Plaintiff and members of the Class were aware of and relied upon Spotify's anti-fraud representations in continuing to distribute ad monetize their music through Spotify. Had Plaintiff and members of the Class known that the rampant artificial streaming was not being remedied and that it selectively declined to police the fraud that most diminished their royalties, they would not have relied on Spotify's royalty allocations and would have acted to protect their revenue shares.

165. Defendant's conduct caused, and continues to cause, financial injury to Plaintiff and members of the Class in the diminution of their streaming revenue shares caused by the rampant streaming fraud taking place on Spotify.

166. Spotify has thus engaged in unfair and fraudulent business acts entitling Plaintiff and members of the Class to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief, including injunctive relief and restitution to reimburse them for the amounts they were deprived as a result of the streaming fraud described above.

167. Additionally, under Business and Professions Code section 17203, Plaintiff and members of the Class seek an order requiring Defendant to immediately cease such acts of unfair and fraudulent business practices and requiring Defendant to correct their actions.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

1. Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2. Ordering that Defendant are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

3. Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4. Awarding restitution and disgorgement of Defendant' revenues and/or profits

FIRST AMENDED COMPLAINT

to Plaintiff and members of the Class;

5.      Awarding declaratory and injunctive relief as permitted by law or equity, including, but not limited to an order directing Defendant, with Court supervision and the assistance of an independent monitor, to identify victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

6.      Awarding injunctive relief directing Defendant, with Court supervision and the assistance of an independent monitor, to identify and remove fraudulent streams on a prospective basis;

7.      Awarding injunctive relief requiring Spotify to update their account creation interface to employ industry standard protocols, including, but not limited to: (a) keystroke and mouse dynamics such as specific typing prompts (e.g., "type the following words or letters"); (b) invisible or standard CAPTCHAs which require dynamic puzzle-solving or proof-of-work (e.g., identify photographs containing specific images); and (c) simple identify verification such as requiring a valid mobile number or credit card that it is difficult for a robot to replicate.

8.      Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

9.      Awarding Plaintiff and members of the class punitive damages;

10.     Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

11.     For such other and further relief as the Court deems just and proper.

FIRST AMENDED COMPLAINT

Dated:  July 13, 2026                          BARON & BUDD, P.C.

                              By:  */s/ Mark Pifko*
                                   Mark Pifko

                                   Daniel Alberstone (SBN 105275)
                                   dalberstone@baronbudd.com
                                   Mark Pifko (SBN 228412)
                                   mpifko@baronbudd.com
                                   Peter Klausner (SBN 271902)
                                   pklausner@baronbudd.com
                                   Baron & Budd, P.C.
                                   15910 Ventura Boulevard, Suite 1600
                                   Los Angeles, California  91436
                                   Telephone:  (818) 839-2333

                                   Marco Palmieri (*pro hac vice*)
                                   mpalmieri@baronbudd.com
                                   Calista Somer (*pro hac vice*)
                                   csomer@baronbudd.com
                                   Baron & Budd, P.C.
                                   2600 Virginia Ave., NW, Suite 900
                                   Washington, D.C.  20037
                                   Telephone:  (202) 333-4562

                                   Anthony Irpino
                                   airpino@irpinolaw.com
                                   Pearl Robertson
                                   probertson@irpinolaw.com
                                   Irpino Law Firm, LLC
                                   2216 Magazine Street
                                   New Orleans, Louisiana  70130
                                   Telephone:  (504) 525-1500

                                   Attorneys for Plaintiff Eric Dwayne Collins,
                                   individually, and on behalf of other members of
                                   the general public similarly situated

FIRST AMENDED COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial of their claims by jury to the extent authorized by law.

Dated:  July 13, 2026                    BARON & BUDD, P.C.

By:   */s/ Mark Pifko*
      Mark Pifko

      Daniel Alberstone (SBN 105275)
      dalberstone@baronbudd.com
      Mark Pifko (SBN 228412)
      mpifko@baronbudd.com
      Peter Klausner (SBN 271902)
      pklausner@baronbudd.com
      Baron & Budd, P.C.
      15910 Ventura Boulevard, Suite 1600
      Los Angeles, California  91436
      Telephone:  (818) 839-2333

      Marco Palmieri (*pro hac vice*)
      mpalmieri@baronbudd.com
      Calista Somer (*pro hac vice*)
      csomer@baronbudd.com
      Baron & Budd, P.C.
      2600 Virginia Ave., NW, Suite 900
      Washington, D.C.  20037
      Telephone:  (202) 333-4562

      Anthony Irpino
      airpino@irpinolaw.com
      Pearl Robertson
      probertson@irpinolaw.com
      Irpino Law Firm, LLC
      2216 Magazine Street
      New Orleans, Louisiana  70130
      Telephone:  (504) 525-1500

      Attorneys for Plaintiff Eric Dwayne Collins,
      individually, and on behalf of other members of
      the general public similarly situated

FIRST AMENDED COMPLAINT