UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-10525-JLS-JDE Date: October 23, 2026
Title: Eric Dwayne Collins v. Spotify USA, Inc. et al

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Kelly Davis | N/A |
| Deputy Clerk | Court Reporter |

| | |
|---|---|
| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| Not Present | Not Present |

**PROCEEDINGS: (IN CHAMBERS) ORDER (1) GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT (Doc. 62); AND (2) DENYING AS MOOT MOTION TO STRIKE (Doc. 63)**

Before the Court is a Motion to Dismiss the First Amended Complaint filed by Defendant Spotify, USA Inc. ("Spotify"). (Mot., Doc. 62.) Plaintiff Eric Dwayne Collins opposed, and Defendant replied. (Opp., Doc. 68; Reply, Doc. 70.) Having taken this matter under submission, and for the following reasons, the Court GRANTS Defendant's Motion.

## I. BACKGROUND

Plaintiff Eric Dwayne Collins, professionally known as RBX, is a rapper and "world-renowned performer" who is "widely recognized for his distinctive voice and influential lyrical contributions to the foundation of West Coast hip-hop." (First Amended Complaint ("FAC") ¶¶ 6, 116, Doc. 59.) He possesses the royalty rights for a "range of notable and commercially successful songs and albums," which are available for streaming on Spotify. (*Id.* ¶ 119.) Spotify is a music streaming platform that Plaintiff alleges has "outsized leverage in the music industry," accounting for "over 31% of the total global market share, with a reported 751 million users[.]" (*Id.* ¶ 52.)

Spotify generates revenue through paid subscriptions and advertisements. (*Id.* ¶ 29.) It then distributes portions of its total revenue pool to "artists, song writers, performers, and other music rights holders." (*Id.* ¶¶ 7, 10.) The portion of the revenue pool an artist will receive is "based on their proportional share of total music streams for that month" (their "streamshare"). (*Id.* ¶ 10.) Thus, "any time [an artist's] share of the revenue pool increases due to increased [streamshare], the shares for other [artists] necessarily decrease." (*Id.* ¶ 30.) Plaintiff alleges that an artist's streamshare not only dictates their monthly royalty payment, but also influences "decisions concerning an artist's career [including whether] the artist will be selected to headline a tour" and is "relevant to other music industry investments that make or break an artist's career." (*Id.* ¶¶ 44–45.)

However, Plaintiff alleges that some artists "resort to cheating" to increase their streamshare. (*Id.* ¶ 2.) Specifically, Plaintiff alleges that bad actors use Spotify's platform to "artificially and fraudulently" inflate music streams for certain artists to increase the streamshare of those artists' tracks, thereby reducing the streamshare of other artists' tracks. (*Id.* ¶ 56.) This practice, which Spotify calls artificial streaming, "is carried out by deploying 'Bots,' which are automated software programs . . . programmed to repeatedly and continuously stream certain songs, thereby fraudulently inflating the total number of streams for that music." (*Id.* ¶ 57.) Bots are often designed "to mimic human behavior and resemble real social media or streaming accounts in order to avoid detection." (*Id.* ¶ 59.) For instance, they may "use Virtual Private Networks [VPNs] . . . to obscure the true location of Bot Accounts, making it appear as though the Bots are streaming music from all over the world, when in reality the Bot Accounts all originate from a small number of locations[.]" (*Id.*) Spotify expressly prohibits artificial streaming, and acknowledges that it leads to misrepresented streamshare and the improper allocation of royalty payments. (*Id.* ¶ 63.)

Spotify states that it has taken steps to prevent artificial streaming. It represents that it "put[s] significant engineering resources and research into detecting, mitigating, and removing artificial streaming activity," and "conduct[s] daily cleaning to ensure artificial streams are removed from public numbers in the Spotify app." (*Id.* ¶ 64.) Additionally, Spotify has implemented a policy where "tracks must achieve a minimum threshold of at least 1,000 streams within the preceding twelve months to qualify for inclusion in the recorded music royalty pool calculation," which it asserts "will eliminate one strategy used to attempt to game the system or hide artificial streaming, as uploaders will no longer be able to generate pennies from an extremely high volume of tracks." (*Id.* ¶ 65.) Further, "Spotify also requires that each track be streamed by a minimum number of unique listeners before becoming eligible for royalty consideration," which "is intended to prevent users from artificially inflating eligibility through repeated or automated streaming activity." (*Id.* ¶ 66.) Finally, Spotify represents that "it will impose financial penalties on labels and distributors in the form of per-track charges when 'flagrant' artificial streaming activity is detected on their content." (*Id.* ¶ 67.)

Plaintiff alleges that Spotify selectively enforces its artificial streaming policies, combatting artificial streaming only when it benefits Spotify. (*Id.* ¶ 70.) Specifically, Plaintiff characterizes Spotify's minimum stream and minimum unique listener requirements as acting to "strip royalties from emerging and independent artists." (*Id.*) Meanwhile, Spotify "declines to apply that same scrutiny to artificial streaming that inflates the catalogs of its highest-volume, 'A-list,' most lucrative artists . . . whose streams drive Spotify's reported monthly active users, engagement metrics, and advertising revenue." (*Id.* ¶ 71.) For instance, Plaintiff points to irregularities in the streaming of the music of Aubrey Drake Graham ("Drake"), a popular artist who "is purportedly the most streamed artist of all time" on Spotify. (*Id.* ¶ 74.) Plaintiff alleges that Drake's streamshare is boosted by artificial streaming, and that Spotify should have known about and addressed the artificial streaming of Drake's music. (*Id.* ¶¶ 74–90.)

Because other artists' streams are being artificially inflated, Plaintiff alleges that his "share of Spotify's revenue pool has been unjustly diminished[.]" (*Id.* ¶ 121.) On November 2, 2025, Plaintiff filed this putative class action, on behalf of himself and other rights holders[1] whose content was hosted on Spotify, bringing claims for (1) negligence, and (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Compl., Doc. 1.) On June 22, 2026, the Court entered an Order dismissing Plaintiff's claims, but granting Plaintiff leave to amend. (Order Granting MTD Compl., Doc. 56.)

Plaintiff has filed a First Amended Complaint ("FAC"), bringing the same claims. Spotify again moves to dismiss.

## II. LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citing *Twombly*, 550 U.S. at 556).

[1] The FAC defines a rights holder as "any individual or entity that owns, controls, or possesses an interest in the intellectual property rights associated with a musical work or sound recording." (FAC ¶ 7 n.2.)

When courts find that a complaint fails to state a claim, they are to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (indicating that leave to amend is granted with "extreme liberality"). But Rule 15's "liberality does not apply when amendment would be futile." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 968 (9th Cir. 2016). A proposed amendment is futile if "no set of facts can be proved under the amendment that would constitute a valid claim or defense." *Abels v. JBC Legal Grp., P.C.*, 229 F.R.D. 152, 157 (N.D. Cal. 2005).

## III. <u>ANALYSIS</u>

### A. Negligence

#### 1. Special Relationship

In its prior Order dismissing Plaintiff's negligence claim, the Court concluded that Spotify had no duty to protect Plaintiff from third-party bots because Plaintiff had not plausibly alleged the existence of a special relationship between Plaintiff and Spotify, or between the third-party bots and Spotify. (Order Granting MTD Compl. at 5–8.) The Court incorporates the same analysis here. Although Plaintiff has included additional facts in his FAC, as explained below, the Court is not swayed from its prior conclusions.

##### a. Special Relationship Between Spotify and Plaintiff

The Court previously concluded that the relationship between Plaintiff and Spotify, as alleged, "is more aptly characterized as a commercial relationship from which both parties derive economic benefits, rather than a relationship where a platform is expected to protect a vulnerable party[.]" (Order Granting MTD Compl. at 6.) The FAC now adds facts that Plaintiff argues show that he is vulnerable compared to Spotify.

Plaintiff alleges, for instance, that "smaller and independent artists . . . have no choice but to upload their music onto [Spotify] because of its universal presence in the music industry."[2] (FAC ¶ 52.) Plaintiff also alleges that artists whose music is owned by record labels are vulnerable because "record labels may have a conflict of interest in attempting to force Spotify to apply its fraudulent streaming policies impartially on behalf of the artists who license their rights to such record labels[.]" (*Id.* ¶ 55.) But it is unclear how these allegations are relevant to the existence of a special relationship. As the Court noted in its previous Order, the special relationships to which Plaintiff analogizes typically "involve an entity which has assumed the role of protector of [a plaintiff's] information or assets." (Order Granting MTD Compl. at 6); *see also Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 620 (2018) ("Generally, [a special] relationship has an aspect of dependency in which one party relies to some degree on the other for protection."). Although Plaintiff may have less power in the music industry as compared to Spotify, that does not mean his relationship with Spotify is characterized by any protection Spotify gives to Plaintiff. Rather, the allegations still show that the parties' relationship is primarily a mutually beneficial economic one, albeit one with a power imbalance typical of an economic relationship between a corporate entity and an individual.

Relatedly, Plaintiff attempts to analogize this case to *In re Accellion, Inc. Data Breach Litigation*, 713 F. Supp. 3d 623 (N.D. Cal. 2024), by arguing that the defendant in *Accellion* and Spotify both protect "non-monetary assets." (Opp. at 12–13.) Specifically, Plaintiff alleges that an artist's streamshare on Spotify has impacts beyond pure

[2] As an initial matter, Plaintiff alleges that he is a world-renowned performer" who is "widely recognized for his distinctive voice and influential lyrical contributions to the foundation of West Coast hip-hop," and possesses the royalty rights for a "range of notable and commercially successful songs and albums" on Spotify. (FAC ¶¶ 6, 116.) Thus, as alleged, Plaintiff is not a small or vulnerable artist. Plaintiff's allegations about the relationships between small artists and Spotify are therefore not relevant to the alleged special relationship between *Plaintiff* and Spotify.

royalties—it impacts the artist's career and opportunities afforded to them, too. (*See, e.g.*, FAC ¶¶ 2, 42–49.) Again, this misses the mark. Unlike the file transfer company in *Accellion*, which "was intended to 'facilitate secure, encrypted file sharing,'" 713 F. Supp. 3d at 629, Spotify's purpose is not to protect Plaintiff's "career and status in the music community." (Opp. at 12–13.) That streaming activity on Spotify's platform may impact Plaintiff's career and status does not transform Spotify's role into one of a protector.

Plaintiff's remaining arguments regarding the existence of a special relationship between him and Spotify rehash arguments the Court rejected in its prior Order. Thus, for the reasons explained above and in the Court's prior Order, Plaintiff has failed to plausibly allege the existence of a special relationship between him and Spotify.

b. **Special Relationship Between Spotify and Third-Party Bots**

Plaintiff primarily analogizes to *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077 (2019), to argue that Spotify has a special relationship with artificial streamers. In *Brown*, the California Court of Appeal found a special relationship between the governing body of taekwondo, which was "responsible for the conduct and administration of taekwondo in the United States," and a taekwondo coach. *Id.* at 1094–95. But Spotify is not a "governing body" of artificial streamers. *Id.* at 1094. Rather, as the Court stated in its prior Order, Spotify exists to "allow[] users to create accounts and stream music," and has not assumed a position of governance over third-party conduct merely by making its services available for third parties to use. (Order Granting MTD Compl. at 8.) Plaintiff alleges no other facts suggesting that Spotify has assumed a position of control over the actions of its listeners. Accordingly, for the reasons stated in its prior Order, Plaintiff has failed to plausibly allege the existence of a special relationship between Spotify and third-party bots.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-10525-JLS-JDE Date: October 23, 2026
Title: Eric Dwayne Collins v. Spotify USA, Inc. et al

### 2. Voluntary Undertaking

Plaintiff alternatively argues that Spotify owes a duty to him pursuant to the voluntary undertaking doctrine. (FAC ¶ 141.) "Under California law, a voluntary undertaking claim requires a showing that (1) an actor undertook to render services to another; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the failure to exercise reasonable care resulted in *physical harm* to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking." *Mayall on Behalf of H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1066 (9th Cir. 2018) (emphasis added). Here, Spotify's alleged failure to adequately mitigate artificial streaming resulted in no *physical* harm to Plaintiff. Plaintiff's voluntary undertaking theory is simply inapplicable in these circumstances. *See UnitedHealthcare Ins. Co. v. Sahara Palm Plaza, LLC*, 2023 WL 6566486, at *1 (9th Cir. Oct. 10, 2023) ("The theory of a voluntary undertaking fails because Third-Party Plaintiffs suffered no physical harm or injury." (citing *Dent v. Nat'l Football League*, 968 F.3d 1126, 1132 (9th Cir. 2020))).

### 3. Conclusion as to Negligence

Because Plaintiff fails to allege a duty owed to him under either a special relationship or voluntary undertaking theory, his negligence claim is dismissed.

### B. UCL

#### 1. Fraudulent Prong

Plaintiff once again alleges that Spotify violated the UCL's fraudulent prong. Specifically, Plaintiff alleges that Spotify engaged in affirmative misrepresentations by (1) stating that it "put[s] significant engineering resources and research into detecting, mitigating, and removing artificial streaming activity" and conducts "daily cleaning to ensure artificial streams are removed from public numbers in the Spotify app"; and (2) stating that daily cleanings are "essential to ensure a level playing field, where nobody is able to use artificial streaming to increase the perceived popularity of their music on Spotify." (FAC ¶¶ 64, 153.)

"To be actionable as an affirmative misrepresentation, a statement must make a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" *Vitt v. Apple Computer, Inc.*, 469 F. App'x 605, 607 (9th Cir. 2012) (quoting *Coastal Abstract Services v. First American Title Insurance Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). Whether an alleged misrepresentation is an absolute statement of fact or mere puffery is a question of law appropriate for decision on a motion to dismiss. *Cook, Perkiss & Liehe, Inc. v. N. California Collection Services Inc.*, 911 F.2d 242, 245 (9th Cir. 1990).

Spotify's representation that daily cleanings are "essential to ensure a level playing field, where nobody is able to use artificial streaming to increase the perceived popularity of their music on Spotify" is not an actionable statement of fact. Spotify's statement is merely one reflecting its aspirations and goals. *See Momtazee v. Fed. Ins. Co.*, 2025 WL 3190788, at *4 (C.D. Cal. Sept. 30, 2025) (Staton, J.) ("[A] statement about Defendant's beliefs is not a guarantee[.]" (citing *In re First Am. Fin. Corp.*, 2021 WL 4807648, at *9 (C.D. Cal. Sept. 22, 2021) (reasoning that a statement about the

defendant's commitments was not false because "commitment is not a word of certainty"))). Plaintiff's citations to cases involving other affirmatively misleading statements are inapposite. (*See* Opp. at 18.) For example, Plaintiff cites to cases involving privacy policies, but those privacy policies contained specific statements about "the extent of the data being collected," *see, e.g.*, *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *10 (N.D. Cal. Feb. 2, 2021), which can be proven false. Spotify's representation that it aims to "ensure a level playing field," by contrast, does not promise to take any specific action with respect to artificial streaming, and thus is not a statement of objective fact that would deceive a reasonable consumer.

Although Spotify's statement that it conducts "daily cleaning to ensure artificial streams are removed from public numbers in the Spotify app" is a more specific, actionable statement, Plaintiff has not shown that it is false or misleading. Plaintiff does not allege any facts showing that Spotify does *not* conduct daily cleaning of artificial streams. The alleged facts suggest only that artificial streaming still exists on Spotify. (*See, e.g.*, FAC ¶ 98 (alleging that Spotify did not cull 500,000 artificial streams until it was "publicly rebuked").) But the fact that some artificial streaming goes unchecked is not sufficient to give rise to the plausible inference that Spotify does not conduct daily cleaning.[3] Thus, Plaintiff has failed to allege facts showing the falsity of Spotify's statement regarding daily cleaning.[4]

[3] Indeed, Plaintiff acknowledges that bots are deployed by "specialized tech and software companies," that they are designed "to mimic human behavior" and "avoid detection," and that "[t]here is no limit to the number of Bots that can be deployed[.]" (FAC ¶¶ 58–60.) Given the wide-scale presence of bots that are designed to "avoid detection" on the platform, an inference that Spotify fails to conduct daily cleaning merely because artificial streams continue to persist on the platform is even more implausible.

[4] For the same reasons, and for reasons explained in the Court's prior Order, Plaintiff has also failed to allege facts showing that Spotify's statement that it "put[s] significant engineering resources and research into detecting, mitigating, and removing artificial streaming activity" is an affirmative misrepresentation. (*See* Order Granting MTD Compl. at 9.)

Finally, Plaintiff alleges that "Spotify's continued failure to disclose its selective enforcement policy" is an actionable omission under the UCL. (Opp. at 68.) But Plaintiff has failed to plausibly allege that Spotify has an undisclosed selective enforcement policy. Plaintiff's theory of Spotify's "selective enforcement" appears to be that it "impos[es] minimum-stream and unique listener thresholds," which tends to limit artificial streaming for smaller artists with fewer streams and listeners, but will not impact "A-list" artists with more streams and listeners. (FAC ¶¶ 70–71.) But the fact that these thresholds exist and may disproportionately impact smaller artists is not hidden from consumers in any way. In fact, as alleged, Spotify has publicly announced the imposition of these thresholds. (*Id.* ¶¶ 64–67.) Other than conclusory statements about Spotify turning a "blind eye" to artificial streaming of tracks from popular artists like Drake, the FAC contains no other allegations about how Spotify selectively enforces its policies against artificial streaming. Because Plaintiff has failed to identify any fact that Spotify has concealed or failed to disclose, his omissions-based claim fails.

Because he does not sufficiently allege deceptive misrepresentation, either by affirmation or omission, Plaintiff's UCL claim for fraudulent business practices is dismissed.

**2. Unfair Prong**

Under the UCL, "a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Plaintiff alleges that Spotify's conduct is unfair because it "offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers," and that "[a]ny purported justification for Defendant'[s] practices is outweighed by the consequences and harm to Plaintiff and the Class." (FAC ¶ 159.) Specifically, Plaintiff argues that "Spotify's undisclosed practice

of selectively applying its artificial streaming countermeasures only in situations when it benefits Spotify . . . is clearly immoral, unethical, oppressive, and unscrupulous." (Opp. at 24.) Plaintiff's unfair prong claim fails for multiple independent reasons.

First, even Plaintiff recognizes that the tests he invokes under the unfair prong are focused on injuries "*to consumers*." (*Id.* (emphasis added); *see also Cel-Tech*, 20 Cal. 4th at 180 (reasoning that the UCL "governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition'"). That is because "'[t]he UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services,' not necessarily to address any conduct that might be viewed as unfair." *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1118 (E.D. Cal. 2024) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002)). However, critically, Plaintiff does not allege that he has suffered harm as consumer or competitor of Spotify. Plaintiff alleges only that he has suffered economic losses as a third-party rights holder of music that is on Spotify's platform. That a third party's financial interests have been affected by a platform's business practices is insufficient to show harm to either consumers or competitors. *See id.* at 1118–19 (focusing on the harm to Gmail users whose emails from the Republican National Committee ("RNC") were diverted to their spam folders, rather than harm to the RNC itself, because "the RNC is not a Gmail user or Google competitor").

Indeed, the facts, as alleged, contradict the notion that Spotify's business practices are harmful to consumers or competitors. For example, Plaintiff alleges that Spotify "creates the ideal conditions for fraudulent Bot Accounts to create fake Spotify accounts" because Spotify's "platform does not require a credit card to establish an account." (FAC ¶¶ 40, 101.) But that allegedly unfair business practice would likely help, not hurt, consumers who wish to create free accounts and listen to music on Spotify. And Plaintiff alleges that Plaintiff and other rights holders would consider Spotify's practices toward

artificial streaming material and may "host[] their works elsewhere on another platform" if they knew about them. (*Id.* ¶¶ 107, 157.) It thus appears that Spotify being "one of the easiest platforms to defraud using Bots" would help, not hurt, competitors. Accordingly, because Plaintiff has not alleged that Spotify's consumers or competitors have suffered any harm, and has instead alleged facts to the contrary, he cannot bring a claim under the unfair prong. *See Republican Nat'l Comm.*, 742 F. Supp. 3d at 1118–19 & n.9.

Second, Plaintiff's unfair prong also fails because he has alleged an unfair prong claim that is indistinct from his fraudulent prong claim. Specifically, the UCL claim based on the unfair prong incorporates by reference the very same conduct alleged to have been fraudulent. (*Compare* FAC ¶ 149 *with* FAC ¶ 158 (each incorporating "the allegations in Paragraphs 1 to 134").) The FAC then alleges that the referenced conduct "also constitutes a violation of the 'unfair' prong." (*Id.* ¶ 159; *see also id.* ¶ 161 ("Spotify concealed the true extent of the [artificial streaming] while representing publicly that it was taking measures to combat it.").) As in his FAC, in his Opposition, Plaintiff repeatedly characterizes Spotify's unfair conduct as having an "*undisclosed practice* of selectively applying its artificial streaming countermeasures only in situations when it benefits Spotify." (Opp. at 23–24 (emphasis added).) This allegation is identical to Plaintiff's claim under the fraudulent prong for Spotify's "continued failure to disclose its selective enforcement policy." (*Id.* at 22.) "[W]here the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Patt v. Antech Diagnostics, Inc.*, 2019 WL 6654078, at *8 (C.D. Cal. July 30, 2019) (quoting *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017)). Because Plaintiff's unfair prong claim is coextensive with his fraudulent prong claim, his unfair prong claim fails on this basis.

Finally, even if Plaintiff's unfair prong were distinct from his fraudulent prong and the harm alleged were consumer-based, Plaintiff would still fail to plausibly allege unfair conduct on the part of Spotify. Plaintiff's claim relies on the conclusory statement that "[i]n comparison to the harm caused by Spotify's failure to act, the burden on Spotify to enforce measures to identify, halt and remedy streaming fraud, including simply impartially enforcing its protocols already in place, was minimal." (FAC ¶ 162.) However, Plaintiff's specific factual allegations belie Plaintiff's assertion that "halting and remedying" artificial streaming would require "minimal" effort by Spotify. Plaintiff acknowledges that bots are deployed by "specialized tech and software companies" in a "coordinated" effort to "manipulat[e] streaming metrics." (*Id.* ¶¶ 57–58.) Plaintiff further acknowledges that bots are designed "to mimic human behavior"; for example, bots may use "a series of technical devices" to "obscure the true location of the Bot Accounts, making it appear as though Bots are streaming music from all over the world[.]" (*Id.* ¶ 59.) Plaintiff does not allege any facts suggesting that halting artificial streaming by these bots, which are designed by "specialized" vendors to "avoid detection," would be easy for Spotify. (*Id.* ¶¶ 58–59.) Such an allegation appears especially implausible in light of Plaintiff's acknowledgment that "[t]here is no limit to the number of Bots than can be deployed," and that they generate "billions of fraudulent streams" every month. (*Id.* ¶¶ 2, 60.)

Plaintiff's argument that Spotify need only "evenly apply its artificial streaming protocols" to halt artificial streaming, which would be simple because such protocols are "already in place" is of no help to Plaintiff. (Opp. at 24; FAC ¶ 162.) As discussed above, the Court finds Plaintiff's allegations that Spotify "chose to selectively enforce" its existing artificial streaming infrastructure against certain artists, but not others, to be entirely conclusory and unsupported. (FAC ¶ 162.) Indeed, Plaintiff does not identify a single protocol that exists but has not been impartially enforced. Rather, Plaintiff's "selective enforcement" theory appears to be that Spotify's existing protocols—namely, minimum-stream and unique listener thresholds—combat artificial streaming of less

popular artists' music, but they do not affect more popular artists with higher stream and listener counts.[5] This is not a theory of selective enforcement, but of disparate impact. Plaintiff does not allege any facts showing that reducing this alleged disparate impact would be easy, cost-effective, or otherwise require minimal effort by Spotify.[6]

Because Plaintiff's unfair prong claim fails on multiple bases, Plaintiff's UCL unfair prong claim is dismissed.

### C. Leave to Amend

The Court already concluded in its prior Order that Plaintiff failed to state a claim for negligence or for violation of the UCL. After granting leave to amend once, and considering the additional facts alleged in the FAC, the Court has found no reason to depart from its prior conclusions.

---

[5] The only specific allegation regarding Spotify's "selective enforcement" of its artificial streaming countermeasures is as follows:

> Spotify rigorously polices the low end of its streaming platform, where enforcement costs Spotify nothing and in fact, benefits its bottom line by imposing minimum-stream and unique listener thresholds that strip royalties from emerging and independent artists. . . .
>
> Yet, at the same time, Spotify declines to apply that same scrutiny to artificial streaming that inflates the catalogs of its highest-volume, "A-list," most lucrative artists such as Drake[.]

(FAC ¶¶ 70–71; *see also* Opp. at 20 (citing the same paragraphs of the FAC to argue that "Spotify intentionally ignores" artificial streaming).)

[6] Similarly, Plaintiff faults Spotify for "not employ[ing] industry standard account-creation protocols," (Opp. at 24), but alleges no facts to show that employing such protocols would require minimal effort or be cost-effective.

Plaintiff argues that he should be granted leave to amend once again. (Opp. at 25–26.) However, the Court finds that further leave to amend would be futile. Indeed, although Plaintiff added facts to his FAC, the additional allegations serve only to flesh out the commercial nature of the parties' relationship, rather than show any hallmarks of a special relationship. And the existing pleadings make clear that Plaintiff cannot allege that he has suffered the physical harm necessary to pursue a voluntary undertaking theory of liability. Finally, even though Plaintiff attempted to introduce a new "selective enforcement" theory to support his UCL claim, he did not allege any additional facts that sufficient to support a claim that Spotify engaged in fraud. And his claim under the unfair prong of the UCL fails for the same reason, and because Plaintiff has not alleged any consumer or competitor-based harm. Accordingly, Plaintiff's negligence and UCL claims are DISMISSED WITH PREJUDICE.

## IV. CONCLUSION

For the above reasons, Defendant's Motion to Dismiss is GRANTED, and Plaintiff's claims are DISMISSED WITH PREJUDICE. Defendant's Motion to Strike is therefore DENIED AS MOOT. Defendant is ORDERED to provide a proposed judgment consistent with this Order within **five (5) days** of the issuance of this Order.

Initials of Deputy Clerk: kd